**T.G.I. EAST COAST CONSTRUCTION CORP., Plaintiff,**

v.

**FIREMAN'S FUND INSURANCE COMPANY and National Preferred Risks, Inc., Defendants.**

**and**

**Titan Group, Inc., Additional Defendant On Counterclaim.**

**FIREMAN'S FUND INSURANCE COMPANY, Third-Party Plaintiff,**

v.

**COTRONEO & COLLETTI CONCRETE, INC., Colletti & Laguidara, Inc., individually and as co-venturers doing business under the name of Cotroneo & Colletti Concrete, Inc. and Colletti & Laguidara, Inc., a Joint Venture, Vincent Colletti, and Orlando Cotroneo, Third-Party Defendants.**

No. 80 Civ. 1120 (MEL).

United States District Court, S.D. New York.

Jan. 9, 1985.

See also D.C., 534 F.Supp. 780.

Shea & Gould, New York City, for defendant Nat. Preferred Risks, Inc.; Richard F. Czaja, Fran M. Jacobs, New York City, of counsel.

M. Carl Levine, Morgulas & Forman, New York City, for plaintiff; Howard M. Rosen, New York City, of counsel.

LASKER, District Judge.

### I.

T.G.I. East Coast Construction Corp. ("TGI") is a general contractor which contracted with the Town of Parsippany-Troy Hills for the construction of an advanced wastewater treatment plant in 1977. It negotiated an agreement with Cotroneo & Colletti Concrete Inc. ("C & C") as subcontractor to do the concrete work on the project. Upon learning that C & C was not in a position to secure a bond for $6 million dollars (the value of the job), TGI and C & C agreed to divide the concrete work into two overlapping subcontracts of approximately $3 million dollars each designated as Phase I and Phase II. Each of the subdivided subcontracts required that C & C furnish a payment and performance bond in the amount of the subcontract price: the Phase I bond was to be furnished forthwith, and at the same time, C & C was to furnish TGI with a commitment that a bond for Phase II would be furnished at a later date.

In response to the requirement for a commitment as to Phase II bonding, C & C arranged for its insurance agent, National Preferred Risks Inc. ("National") to write the following letter dated June 30, 1977 to TGI (the June 30 letter), which is quoted as written:

> Please be advised that upon successful completion of 80% of phase I concrete work, Parsippany Wastewater Treatment Plant, awarded to the above captioned, in the amount of $2,720,000. We will provide a Performance and Payment bond for the second phase in the amount of $2,988,000.
>
> This bond will be executed on a form suitable to us as surety and subject to our normal underwriting requirements. The oblegee [sic] under the bond will be T.G.I. East Coast Construction Corporation.

Although the parties knew that National was an insurance agent that did not itself underwrite bonds, TGI accepted the letter

and it entered into the two subcontracts with C & C that summer.

In September, 1977, C & C provided TGI with payment and performance bonds for Phase I of the project. The bonding was issued by Fireman's Fund as surety. For reasons not material here, commencement of the work on Phase I was delayed for almost one year until August 4, 1978. Phase II began in December, 1978. In September, 1979, Phase I was 80% completed.

In the period between National's letter of June 30, 1977 and September, 1979 (when Phase I was 80% completed and TGI expected a Phase II bond to issue), C & C experienced serious financial difficulties that impaired and ultimately killed its ability to obtain further bonding. Fireman's Fund, the surety for C & C on Phase I, notified National in 1978 of suspensions of C & C's bonding line of credit.[1] In July, 1979, without a Phase II bond ever having issued, Fireman's Fund advised National that it would no longer bond C & C at all.[2] National allegedly never informed TGI of these facts.[3]

At the point of 80% completion of Phase I in September, 1979, TGI made demands upon C & C to furnish the Phase II bond. At no time did TGI make any demands on National directly. C & C failed to produce the bond before abandoning the job unfinished due to financial difficulties in December, 1979. TGI then declared C & C in default and instituted suit against both Fireman's Fund and National to recover damages incurred to complete Phase II.[4] TGI's complaint against National alleges

that the June 30 letter was a representation either willfully false or negligently made upon which it reasonably relied to its detriment.

## II.

National moves for summary judgment on the grounds that 1) TGI could not, as a matter of law, reasonably rely upon the June 30 letter as a representation that C & C would be unconditionally bonded for Phase II upon 80% completion of Phase I regardless of C & C's financial status at the time; 2) when TGI permitted C & C to remain on the job without a Phase II bond from September, 1979 until the December abandonment, it waived any right it might otherwise have had to rely upon on any alleged representations contained in the June 30 letter from National; and 3) TGI's claim that National breached a duty to advise TGI of C & C's bonding status is unpleaded, and in any event, unactionable because National owed no duty to TGI that would mandate such disclosure.

### Reasonable Reliance

National argues that TGI could not, as a matter of law, reasonably rely on its June 30 letter as a representation that C & C would be bonded for Phase II upon 80% completion of Phase I if C & C was not financially sound at that time because (a) the letter itself stated that the bond was "subject to our normal underwriting requirements" which were not met in this instance, and (b) any reliance on National's June 30 letter as a bonding commitment was unreasonable because it was contrary

1. In April, 1978 and again in July and October, 1978, Fireman's Fund notified National that it placed a temporary stop order suspending C & C's bonding line of credit because of its inability to obtain financial reports from C & C and because C & C had already exceeded its bonding capacity of $5–6 million.

2. A permanent stop order issued in July, 1979 when Fireman's Fund notified National that it would no longer bond C & C because it had suffered financial losses for two years running, its net worth and working capital had continued to drop for three years in a row, its financial

statements were prepared by two different accountants and were uncertified, and it had not submitted underwriting information regularly and promptly. No bond was issued for Phase II before Fireman's Fund cut off C & C's bonding.

3. TGI alleges that it was unaware of C & C's financial difficulties until August or September, 1979 when it became known that C & C was not paying its suppliers.

4. TGI asserts additional claims against Fireman's Fund relating to both the Phase I and Phase II subcontractors.

to TGI's own company policy to accept an agent's letter as a bonding commitment.

In support of its motion, National has submitted the deposition of Joseph Vallone, Fidelity and Surety Manager of Fireman's Fund, which states that "normal underwriting requirements" in the industry are "to have a financially sound principal with experience in the field in which they are . . . requiring the bond." [5] On the basis of this evidence National contends that the letter represented that C & C would be bonded upon satisfaction of two conditions, namely, 80% completion of Phase I *and* C & C meeting normal underwriting requirements of financial soundness. National argues that, because C & C was not financially sound upon the date of 80% completion of Phase I, TGI could not reasonably rely upon National to furnish the bond. In response, TGI contends that it understood the phrase, "subject to our normal bonding requirements" to refer to mere technicalities of the bonding companies,[6] and that reliance upon National to provide bonding for C & C upon the 80% date regardless of its financial condition was therefore reasonable.

■ For the purposes of argument, TGI's belief in its construction of the meaning of the June 30 letter is accepted as true. The issue then would be whether TGI was reasonable in its belief. Objectively viewed, the letter clearly communicated that Phase II bonding was subject to a condition of "normal underwriting requirements." As we see it, such language should at least have put TGI on notice to inquire into its precise meaning before TGI could reasonably assume that the phrase referred to irrelevant technicalities. We therefore conclude that if TGI relied on the June 30 letter as a representation that Na-

tional would provide Phase II bonding upon the 80% completion date regardless of the financial status of C & C at that time, its reliance was unreasonable.[7] Accordingly, National is entitled to summary judgment on this ground.

*Waiver*

National also argues that TGI waived any rights of reasonable reliance when it permitted C & C to remain on the job unbonded from the Phase I 80% completion date in September, 1979 until C & C's abandonment in December. TGI contends that it did not waive its reliance because (a) the waiver was not in writing as required by the contract between C & C and TGI; and (b) TGI made demands on C & C during that period to produce the bond.

■ TGI's contention that any waiver as to National had to be in writing is without substance. The provision in the contract between C & C and TGI that waivers must be written is not binding upon National which was not a party to that contract.

■ A requirement in a subcontract that the subcontractor provide bonding is waived by the contractor if he knowingly permits the subcontractor to proceed with the work unbonded. *See Sehlbert Mechanical Corp. v. Kessel/Duff Construction Corp.,* 79 A.D.2d 680, 433 N.Y.S.2d 866 (2nd Dept.1980); *Hevenor v. Union Ry.,* 204 A.D. 535, 198 N.Y.S. 409 (1st Dept. 1923). The waiver is implied by law because the conduct of the contractor is inconsistent with an intent to enforce his rights. *See id.*

■ TGI contends that its demands upon C & C to produce a bond renders this well-established rule inapplicable. However, here the claim of reasonable reliance

---

**5.** National's Affidavit in Support of Motion, filed October 20, 1983 at Exhibit F.

**6.** TGI's Affidavit in Opposition to Motion, filed November 21, 1981 at Exhibit M.

**7.** National's remaining contention is that TGI could not reasonably rely upon an agent's letter as a bonding commitment because it was con-

trary to TGI's own policy to require either the bond itself or a letter from an underwriter as a commitment. This assertion presents questions of fact that are not appropriate for summary disposition. The fact that TGI may have generally relied upon alternative forms of commitment in the past cannot be dispositive on the issue of whether or not TGI so relied in this instance.

is asserted by the contractor against the bonding agent, and it is the agent who asserts waiver against TGI because TGI did not make a demand on the agent for production of a bond. In this context, TGI's conduct *as to National* was inconsistent with an intent to continue reliance upon National directly. This is so because TGI permitted C & C to continue on the job unbonded without making a demand on National for the bond. *See, e.g., Lesser v. Cord*, 349 F.2d 490 (8th Cir.1965) (Blackmun, J.) (contractor waived right of reasonable reliance upon agent to produce bond by permitting subcontractor to work unbonded). As TGI's conduct as to National was inconsistent with an intent to continue reliance upon National, we conclude that TGI thereby waived its reliance upon National. National is therefore entitled to summary judgment on this ground as well.

*Wrongful Conduct*

■ TGI asserts, for the first time in its affidavits in opposition to this motion, that its claim against National goes beyond reasonable reliance upon the June 30 letter to a claim of "wrongful conduct" by National for which TGI suffered damages. National objects to the claim as unpleaded and unactionable. A review of the complaint supports National's argument that the claim is not pleaded. Moreover, TGI cites no authority and we know of none that would require the affirmative action which TGI claims it was National's duty to undertake.[8] Indeed, the authority seems to be to the contrary. *See, e.g., White v. Guarente*, 43 N.Y.2d 356, 363, 372 N.E.2d 315, 319, 401 N.Y.S.2d 474, 478 (1977) (a negligent misrepresentation or omission is not actionable unless the maker is bound by a "relation of duty" to the other party).

For the foregoing reasons, National's motion for summary judgment is granted and the complaint is dismissed as to National.

It is so ordered.

---

**8.** More specifically, TGI alleges that National's failure to advise Fireman's Fund of the Phase II bonding caused C & C to use up its bonding capacity on other jobs, thus becoming unable to obtain the Phase II bond for the TGI project. TGI also alleges that National's failure to inform TGI of the temporary stop orders on C & C bonding in April, 1978—before the commencement of Phase I and the December, 1978 commencement of Phase II—caused TGI to continue reliance on C & C being bonded to its detriment. It argues that if TGI had known of C & C's inability to secure a bond at that time, it could have replaced C & C on Phase II without incurring damages later.