**LONE MOUNTAIN PRODUCTION COMPANY, a Montana Corporation, Plaintiff,**

**v.**

**NATURAL GAS PIPELINE COMPANY OF AMERICA, a Delaware Corporation, Defendant.**

Civ. No. 87–C–0187 A.

United States District Court,
D. Utah, C.D.

April 5, 1989.

Edward W. Clyde, John W. Anderson, Anneli R. Smith, Salt Lake City, Utah, for plaintiff.

Stewart Hanson, Jr., Francis Carney, and Charles P. Sampson, Salt Lake City, Utah, for defendant.

## MEMORANDUM DECISION

(In Lieu of Findings of Fact and Conclusions of Law—FRCP 52(a))

ALDON J. ANDERSON, Senior District Judge.

The plaintiff, Lone Mountain Production Company ("Lone Mountain"), brought this action to enforce the terms of a ten-year "take or pay" gas purchase contract under which its alleged predecessor in interest, GEO Oil and Gas Company of Houston ("GEO"), agreed to sell gas to the defendant, Natural Gas Pipeline Company of America ("Natural").

Trial was bifurcated, with a non-jury trial being held on September 12–13, 1988 to determine Natural's liability under the contract. At the conclusion of the trial, the court took the matter under advisement and invited the parties to submit post-trial briefs.

For reasons discussed below, the court finds that Lone Mountain is entitled to enforce the contract against Natural.

## FACTUAL BACKGROUND

On June 8, 1971, the State of Utah issued Mineral Lease 27564 covering a 600–acre tract located in Section 32, T16S, R26E, SLB & M to the Anschutz Corporation, Inc. (Plaintiff's Exhibit "1"). By April 1980, the lease had been divided into two parcels of 280 and 320 acres each. The lease had also been segregated vertically into upper and lower strata at a level 4,338 feet deep.

On April 18, 1980, Natural signed three contracts to purchase gas from the owners of interests in the upper stratum of the 280–acre parcel. (*See* Plaintiff's Exhibits "3–5".) The three contracts have identical terms.[1] They differ only in the identity of the sellers and the identity of the leasehold

interests each seller committed to performance of the contract. The contracts enabled Natural to obtain the exclusive right to purchase all gas produced from the segregated parcel, regardless of who might ultimately become its owner.[2]

The contracts require Natural either to take the gas at the contract price and in the contract quantities or to pay for the gas and take it at a later date. These "take or pay" contracts, common in oil and gas transactions, give the seller access to a delivery system and market for its gas, while assuring the buyer of a gas supply at the bargained-for contract price. *See* 4 H. Williams, *Oil and Gas Law* § 724.5 (1988).

The first gas purchase contract was with GEO, which owned 100% of the operating rights (the working interest minus the royalty interest), subject to a 6¼% overriding royalty and a reversionary interest. The second contract was with Texoma Company ("Texoma"), which owned 50% of both the overriding royalty and the reversionary interest. The third contract was with Nicor Exploration Company ("Nicor"), which owned the remaining 50% of the overriding royalty and the reversionary interest.

The reversionary interest gave Texoma and Nicor the option to convert their overriding royalty into a 50% working interest upon payout.

Quinoco Oil & Gas Programs ("Quinoco") succeeded to GEO's interest, and MidCon Central Exploration Company ("MidCon") succeeded to Texoma's interest. The options to convert the overriding royalty into a working interest were exercised. Thus, Natural recognizes that the succession and/or titles to the operating rights were as follows: Quinoco 50%, Nicor 25% and MidCon 25% (Pretrial Order, at 20.).

Lone Mountain then entered into farmout agreements with Quinoco, Nicor and MidCon (Plaintiff's Exhibits "14–16"). Under the farmout agreements, Lone Mountain would receive all of Quinoco's and

---

1. The pricing was different for each contract because of certain technical amendments.

2. The two contracts with Nicor and Texoma were necessary to "tie up" all the gas, since a lone contract with GEO could have been circumvented by the convertible interests held by Nicor and Texoma.

Nicor's operating rights and most of Mid-Con's operating rights in exchange for drilling a producing well.

MidCon assigned its operating rights to Apache Corporation ("Apache") (Plaintiff's Exhibit "21").

Lone Mountain succeeded in drilling a producing well and received the promised assignments of operating rights from Quinoco, Nicor and Apache (Plaintiff's Exhibits "18–20" & "22").

Before beginning to drill on the contract acreage, Lone Mountain notified Natural that Quinoco had designated it as operator, that it intended to drill a well, that the well location was committed under the GEO contract,[3] and that the drilling operations would commence by May 15, 1986 (Plaintiff's Exhibit "17"). Natural did not respond to this notification.

Upon completion of the well, Lone Mountain provided Natural with state completion notices and a drilling and completion history (Plaintiff's Exhibit "23"). Pursuant to the GEO contract, Lone Mountain then made demand upon Natural to connect the well to its gathering system.

On July 22, 1986, Natural acknowledged that the well had been submitted for contract consideration and demanded that its delivery agent, Northwest Pipeline Company, establish a point of delivery (Plaintiff's Exhibit "36"). However, on September 9, 1986, Natural declined to connect Lone Mountain's well to its gathering facilities, invoking the *force majeure* clause of the GEO contract (Plaintiff's Exhibits "24" & "30"). Natural requested copies of the assignments of interest and farmout agreements and offered to release Lone Mountain from its obligations under the GEO contract (Plaintiff's Exhibit "26").

On September 30, 1986, Lone Mountain advised Natural of its intent to exercise the option of proceeding on its own to connect the well to the gathering facilities (Plaintiff's Exhibit "25"). Natural then directed Lone Mountain to coordinate the pipeline connection. Lone Mountain made the con-nection at a mutually acceptable point on October 15, 1986, at a cost of $25,000.00.

On December 2, 1986, Lone Mountain furnished Natural with copies of its assignments of interest and farmout agreements (Plaintiff's Exhibit "31"). By letter dated December 9, 1986, Natural replied that it would recognize Lone Mountain's interest in the gas "with the understanding that a succession letter agreement substantially in the form of the attached will be executed...." (Plaintiff's Exhibit "32"). On February 17, 1987, Lone Mountain sent Natural the executed succession agreements in the requested form (Plaintiff's Exhibits "33" & "34").

Lone Mountain commenced this action to enforce the GEO contract on March 6, 1987.

### ISSUES

On January 14, 1988, nearly two years after the well connection was made, Natural began arguing that a formal contractual assignment was needed, in addition to the succession agreements.

Before this action was commenced, Natural sought to justify its failure to perform on the basis of *force majeure*. During the course of the litigation, Natural argued that its failure to perform was justified because of impossibility of performance, commercial impracticability, frustration of purpose, and because the "take or pay" provision is contrary to public policy and the original intent of the parties. At trial, Natural dropped these defenses and instead asserted that the farmout and succession agreements did not constitute a proper assignment of the original contract. Natural also argued that its duty to "take or pay" had not yet matured because certain conditions precedent to the contract had not been satisfied.

Lone Mountain maintains that it is entitled to enforce the contract against Natural because: (1) all conditions precedent had been satisfied as of February 12, 1987; (2)

---

**3.** Lone Mountain was only aware of the GEO purchase contract at the time of the commencement of drilling. However, Lone Mountain owns 100% of the production from the well and 93.75% of the operating rights in the segregated parcel. (Pretrial Order at 24, ¶ 17.)

the provision that the contractual covenants would "run" with the lease obviates the need for any formal assignment; (3) the succession agreements constitute a valid assignment; and (4) Natural has waived, or should be estopped from demanding, strict compliance with the original contract.

## DISCUSSION

### 1. *Conditions Precedent to the Contract*

Natural claimed a failure of conditions precedent because Lone Mountain failed to connect the well to Northwest Pipeline's gas transmission facilities and failed to provide the requisite succession agreements. Lone Mountain connected the well on October 15, 1986 (Plaintiff's Exhibits "26" & "27"). On February 12, 1987, Lone Mountain sent a letter to Natural, indicating that the requested succession agreements were enclosed (Plaintiff's Exhibit "34"). Apparently, the originals were not enclosed in that letter but were forwarded with a follow-up letter dated February 17, 1987 (Plaintiff's Exhibit "33"). Thus, Natural's duty to "take or pay" for the gas matured by February 17, 1987 if the succession agreements satisfy the requirements of the GEO contract.

### 2. *Succession Agreements as Assignments of the Contract*[4]

 The law favors the assignability of contract rights, unless the assignment would add to or materially alter the obligor's duty of risk. *Clark v. Shelton,* 584 P.2d 875, 877 (Utah 1978). An assignment is subject to the same requisites for validity as are other contracts; *i.e.,* mutuality of assent, proper parties with the capacity to make a contract, consideration and legal subject matter. *Certified Collectors, Inc. v. Lesnick,* 116 Ariz. 601, 570 P.2d 769, 771 (1977). However, no particular form is necessary to effect a valid assignment. *Commodore v. Armour & Company,* 201 Kan.

412, 441 P.2d 815, 820 (1968). Furthermore, the language may be informal as long as the assignment shows an intention by the owner to transfer his right or interest in property. *Seasons, Inc. v. Atwell,* 86 N.M. 751, 527 P.2d 792, 795 (1974). Once a valid assignment is made, the assignee stands in the shoes of the assignor; the assignee gains nothing more than his assignor had. *AIRD Ins. Agency v. Zion's First Nat. Bank,* 612 P.2d 341, 344 (Utah 1980).

 Natural insists that the succession agreements, which otherwise might be valid, do not comply with the assignment provision of the original GEO contract. Natural argues that it was not obligated to recognize the succession agreements between Quinoco and Lone Mountain until the formalities called for in the original contract were followed.

The GEO contract contains the following provision, designed to ensure that the covenants would "run" with the leases:

> Seller may, without the prior written consent of Pipeline, make a complete or partial assignment of Seller's leases covered by this Contract. All covenants, stipulations, terms conditions and provisions of this Contract shall extend to and be binding upon the respective successors and assigns of the parties hereto and shall be deemed covenants running with the oil and gas leases and other properties described herein for the full term of this Contract. Any complete or partial assignment of Seller's leases shall contain a provision expressly obligating Seller's assignee to perform Seller's obligations under this Contract and to suffer and permit the full performance thereof. Seller shall promptly provide a copy of any such agreement to Pipeline.

(Article 15, ¶ 2, GEO contract. *See* Plaintiff's Exhibit "3").

The contract further provides:

> Upon prior written notice to the other party, this Contract may be assigned by

---

**4.** Since the court has found that (1) there was a valid assignment that complied with the spirit of the original gas purchase contract; and (2) Natural has waived and is estopped from requiring strict compliance with the original assignment provision, it is unnecessary to decide whether the provision that covenants would "run" with the lease obviates the need for any formal assignment.

either of the parties hereto to any person, firm or corporation who shall acquire the assigning party's interest in the properties necessary to perform this Contract; provided, however, that each of the parties hereto covenant and agree that it will, as an integral part of any such assignment, require the assignee thereunder to expressly adopt and assume the terms and provisions of this Contract and to be bound hereunder as to any interest so acquired. Nothing in this Paragraph 3 contained, however, shall be construed to prevent either party hereto from pledging this Contract, or all or any portion of such party's property as security under any mortgage, deed of trust, or other similar lien, or from pledging any benefits accruing hereunder to the party making the pledge, nor shall the requirements of this Paragraph 3 be deemed applicable thereto.

(Article 15, ¶ 3, GEO contract. *See* Defendant's Exhibit "65").

Admittedly, strict compliance with all these formalities was not accomplished until the spring of 1988.

These formalities were designed to ensure that the contract remained in force regardless of any assignment of the parties' obligations. In other words, any assignment of the contract must obligate either the buyer or the seller's assignee to continue buying or selling gas at the same contractual rate and price.

The succession agreement between Quinoco and Lone Mountain contained the following provision:

Assignee [Lone Mountain] and Natural hereby acknowledge that the interest Assignee has acquired, the acreage covered thereby and the gas produced therefrom are subject to the referenced contract [GEO contract]. Assignee hereby adopts and ratifies all of the terms, provisions and amendments of said Contract and hereby assumes all obligations originally assumed by Assignor [Quinoco] under that Contract as amended and ratified.

(Plaintiff's Exhibit "33", at 2).

The effect of this provision was to ensure that Lone Mountain would be bound by the terms of the original gas purchase contract. It required Lone Mountain to stand in the shoes of the assignor and comply with all contractual conditions that Quinoco (and previously, GEO) was obligated to perform under the original contract.

Natural had previously recognized the assignment of other operating interests as valid contractual assignments of gas purchase contracts. Lone Mountain introduced evidence that Natural had ratified and/or performed under eight other assignments. (*See* Plaintiff's Exhibits "6–13".) Furthermore, Natural had recognized the interest which Quinoco received from GEO by a virtually identical assignment (Plaintiff's Exhibit "11"). Thus, Natural's argument that the assignment did not comply with the original gas purchase contract is a distinction without a difference. Lone Mountain's succession agreement from Quinoco complied with the spirit, if not the letter, of the assignment provision found in the original contract.

■ Even if the succession agreement did not constitute a valid contractual assignment, Natural would not be free from liability. Parties to written contracts may modify or waive terms despite contractual provisions to the contrary. *Dillman v. Massey Ferguson, Inc.*, 13 Utah 2d 142, 369 P.2d 296, 298 (1962). It is well established that if parties to a contract adopt a mode of performance which differs from the strict terms of the contract, neither party can assert a breach because the contract was not fulfilled according to its letter. *Jackson v. Nangle*, 677 P.2d 242, 249 (Alaska 1984); *Quin Blair Enterprises, Inc. v. Julien Construction Co.*, 597 P.2d 945, 951 (Wyo.1979); *Shaeffer v. Kelton*, 95 N.M. 182, 619 P.2d 1226, 1230 (1980).

3. *Waiver and Estoppel*

■ Both waiver and estoppel can operate to prevent a party from demanding strict compliance with a contract. Lone Mountain takes the position that Natural waived the formal requirements of the

original contract and is now estopped from denying the validity of the succession agreements as valid contractual assignments.

The principles of waiver and estoppel support the notion that one party to a contract may not lull the other into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance. *Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir.1979) *cert. denied* 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980).

 In a contractual setting, waiver occurs when an obligor manifests an intent not to require an obligee to strictly comply with a contractual duty. *American Dairy Queen v. Brown–Port Co.*, 621 F.2d 255, 255–257 & n. 1 (7th Cir.1980). *See also Geldermann, Inc., v. Fenimore*, 663 F.Supp. 590, 592 (N.D.Ill.1987). The applicability of waiver depends on the intent of the non-breaching party. If he has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement. *Saverslak*, 606 F.2d at 213. *See also Morgan v. Quailbrook Condominium Co.*, 704 P.2d 573, 578 (Utah 1985); *Hunter v. Hunter*, 669 P.2d 430, 432 (Utah 1983); *Chicago College of Osteo. v. George A. Fuller Co.*, 776 F.2d 198, 202 (7th Cir.1985).

 Waiver can be express or implied; it is shown by the party's words or deeds inconsistent with an intent to insist on his contractual rights. *Id.; T.G.I. East Coast Const. v. Fireman's Fund Ins. Co.*, 600 F.Supp. 178, 181 (S.D.N.Y.1985). To constitute waiver, the party's actions or conduct must be distinctly made, must evince in some unequivocal manner an intent to waive, and must be inconsistent with any other intent. *Hunter*, 669 P.2d at 432.

 Of course, the fact that a party has not enforced a provision in another contract on a previous occasion does not grant the other party a license to ignore that provision in subsequent contracts.

*W.P. Harlin Construction Co. v. Utah State Road Com'n*, 19 Utah 2d 364, 431 P.2d 792, 794 (1967). However, waiver applies when a party to a contract deliberately misleads another party into believing that he doesn't have to comply strictly with contractual requirements. When the other party has relied upon such a representation and gotten into a position where it is practically impossible to comply strictly, the first party may not suddenly reverse his position in order to get out of the transaction. *Caldwell v. Anschutz Drilling Company*, 13 Utah 2d 177, 369 P.2d 964, 966 (1962).

 Estoppel, on the other hand, focuses not on the obligor's intent, but on the effects of his conduct on the obligee. *Saverslak*, 606 F.2d at 213. Estoppel precludes parties from asserting their rights where their actions or conduct render it inequitable to allow them to assert those rights. *Hunter v. Hunter*, 669 P.2d at 432. The doctrine of estoppel has application when a party, by his acts, representations, or conduct, or by his silence when he ought to speak, induces another party to believe certain facts exist and the other party relies thereon to his detriment. *Id.* at 432 (quoting *Leaver v. Grose*, 610 P.2d 1262, 1264 (Utah 1980)). Where an expression of waiver is followed by a substantial and detrimental change in the position of the other party to the contract, a court is amply justified in applying the doctrine of estoppel. *Shaeffer v. Kelton*, 619 P.2d at 1230. Even if the obligor has not waived a known right, he may be estopped from enforcing it. *Saverslak*, 606 F.2d at 213.

 The burden of proof and persuasion on issues of estoppel is on the party who asserts it. *Corporation Nine v. Taylor*, 30 Utah 2d 47, 513 P.2d 417, 420 (1973). Because the test for estoppel is objective in nature, the party asserting it must show that his reliance was reasonable under the circumstances. *Big Butte Ranch, Inc. v. Holm*, 570 P.2d 690, 691 (Utah 1977); *Corporation Nine*, 513 P.2d at 420.

■ Estoppel may also apply where a party to a contract raises defenses other than those originally given; that is, where the other party could have remedied defects but relied on the initially stated defenses to his injury. *Flagship Cruises, Ltd v. New England Merchants,* 569 F.2d 699, 703 (1st Cir.1978).

■ There is substantial evidence to support a finding that Natural waived its right to demand strict compliance with the assignment provision of the gas purchase contract and should be estopped from asserting this defense against Lone Mountain. First, Natural sent blank succession agreement forms for Lone Mountain to use in showing its succession to Quinoco's interest under the original contract. This clearly signaled to Lone Mountain that the assignment would be valid once the succession agreements were completed and returned. They were properly signed and returned to defendant on February 17, 1987 (Plaintiff's Exhibit "33").

Second, Natural sent correspondence to Lone Mountain, stating that it would recognize Lone Mountain's interest in the contract acreage once the succession agreements were signed and returned (Plaintiff's Exhibit "32").

Third, Natural recognized Quinoco's operating interest without insisting on formal compliance with the original contract. (*See* Defendant's Exhibit "54".) Lone Mountain's assignment from Quinoco was virtually identical in terms to Quinoco's assignment from GEO (Plaintiff's Exhibit "11").

Fourth, Natural recognized other operators' interests through assignments on at least eight separate occasions. (*See* Plaintiff's Exhibits "2", "6–10", "12" & "13".)

This evidence overwhelmingly supports a finding that defendant waived formal compliance with the assignment provisions of the original contract, and that a proper succession agreement would be a valid assignment of interests therein. The evidence also supports a finding that Natural should be estopped from denying liability because of deficiencies in the assignment.

Lone Mountain's succession agreement unequivocally committed it to perform under the contract, as the assignment provision was designed to ensure. More important, Natural waited nearly two years after Lone Mountain attempted to enforce the contract, and one year after the filing of this lawsuit, to claim that the assignment of the contract was invalid.

If the invalidity argument had been raised at the appropriate time, Lone Mountain could have promptly remedied the deficiencies and tendered a valid assignment of the original contract to Natural. It would be inequitable for Natural to be relieved of liability on the basis of defects which Lone Mountain could have cured if it had not relied on Natural's conduct and representations.

Natural is therefore estopped from requiring that Lone Mountain strictly comply with the assignment provision of the original contract.

## CONCLUSION

Natural's argument that there was no valid contractual assignment is without merit, since the succession agreements fulfilled the purposes of the assignment provision of the original contract. Furthermore, Natural is estopped from demanding strict compliance with the assignment provision of the gas purchase contract by indicating to the Lone Mountain that it would recognize Lone Mountain's operating interest. This court therefore finds that Natural is liable to take or pay for gas under the contract from February 17, 1987, when Lone Mountain's well was connected to Natural's pipeline and Natural was furnished with the original succession agreements.