Neel, J.
This is a breach of contract claim involving the sale of an equipment lease. Plaintiff, Societe Generale Financial Corp. (SGFC), purchased from defendant, Graphics Leasing Corporation (Graphics), a lease between Graphics and dismissed defendant National Investor News, Inc. (“National”). The purchase agreement between SGFC and Graphics included a *463 buy-back provision, requiring Graphics to repurchase the lease in the event National defaulted on its payments to SGFC. National defaulted, and SGFC now claims that Graphics breached the purchase agreement by failing to repurchase the lease.
The claim against Graphics was tried without jury on August 3, August 5 and November 18, 1993, and the parties’ proposed findings and rulings were complete on December 21, 1993. For the reasons stated below, the Court rules that defendant Graphics breached its obligation to repurchase, and orders judgment for SGFC on Count I of the complaint.
FINDINGS OF FACT
On the basis of the credible evidence presented at trial, the Court makes the following findings.
On January 12, 1989, SGFC and Graphics executed a “Purchase of Paper Agreement” (“Agreement”), which set forth the terms under which SGFC would purchase from Graphics chattel paper evidencing approximately thirty of Graphics’ equipment leases with third parties. One such lease, between Graphics, as lessor, and National, as lessee (the “Lease”), is the subject of this litigation.
The Agreement provides that lessees would make their monthly lease payments to SGFC. National’s first periodic payment to SGFC, following the purchase of the Lease, was due December 1, 1989. National failed to make that payment, and on December 31,1990 was in “Early Default,” as defined by the Agreement, triggering SGFC’s repurchase option.[1] If the Lease is “New Paper,” as defined by the Agreement, Graphics is required to repurchase it, upon request, if the first payment is thirty days late. As previously ruled by the Court (Memorandum of Decision and Order on Plaintiffs and Defendant’s Motions for Summary Judgment (Neel, J.) January 29, 1993), and as now stipulated by the parties, the Lease is New Paper.
By letter dated December 20, 1989, SGFC gave Graphics notice that National had failed to make its December installment.
After National’s Early Default on December 31, 1989, Domenica Simone, Portfolio Services Officer of SGFC, sent another letter by regular first class mail on January 8, 1990, requesting that Graphics repurchase the Lease as required by Article 6.1(b) of the Agreement. That letter complied with the “Notices” provision of the Agreement, which requires at Article 10.2 that “(a]ll notices, requests and other communications hereunder shall be in writing . . .”
Article 10.2 further provides that such requests “shall be deemed to have been given when delivered, if sent by messenger, or five (5) business days after mailing, if sent by registered or certified, postage prepaid mail, return receipt requested ...” The Agreement is silent as to when requests sent by regular mail are deemed to have been given. There was no direct evidence to prove the date on which Graphics actually received the January 8, 1990 letter.
First class mail will usually be delivered within three days after mailing.
On January 9, 1990, Terri Ciochetti, a collections agent at SGFC’s San Francisco office, spoke with a representative of National regarding the late payment.
On January 12,1990, Norma Yacoubi, a collections agent at SGFC, spoke with “Debbie,” a representative of Graphics, regarding the late payment and National’s future ability to make its payments for December and January.
On January 16, 1990, Terri Ciochetti again spoke with a representative of National, who stated that National had sent payment to a Graphics agent, Irv Ellis in Phoenix, Arizona.
On January 17, 1990, SGFC received National’s check no. 1031 (drawn on the account of “I.T. Publications, Inc.,” an affiliate of National, on National’s behalf) in the amount of $2,116.28. That check was deposited and was dishonored on January 19, 1990, and again on January 25, 1990.
Check no. 1031 was automatically redeposited by SGFC’s depository bank after it first failed to clear on January 19. SGFC’s depository bank advised SGFC of check no. 1031’s failure to clear only after it had been returned for insufficient funds the second time on January 25. SGFC received that advice on January 31, 1991, on which date it entered a “payment reversal” on its internal record of National’s account, reversing the credit previously entered on January 17 for check no. 1031.
On January 17, 1990, Domenica Simone of SGFC sent a letter to Nelson Smith of Graphics, again via regular mail. That letter was sent after SGFC received check no. 1031. After thanking Graphics “for your assistance in collecting the lease payments from" National, Simone states:
However, due to customers (sic) inabilfiy to make timely payments from the point of inception of the lease, and the reasons leading to the lessee’s default, we would like to extend our right to request repurchase of this transaction for an additional 60 days.
... Should you not agree, our request of repurchase contained in my letter of January 8, 1990 remains in full force and effect.
Graphics did not agree to the proposed extension of SGFC’s right to request repurchase.
Also on January 17, 1990, Simone advised Debbie at Graphics by telephone that SGFC had received check no. 1031. Debbie told Simone that another payment would be sent the following week.
On January 23, 1990, Terri Ciochetti spoke by telephone with Debbie at Graphics, who said she would speak with the Graphics salesperson dealing *464 with National and “let [Ciochetti] know if payment has been sent yet.”
On January 25, 1990, Ciochetti spoke by telephone with Harold Gold, Graphics’ president. Gold told her that Hunter Brashier, president of National, was to “call [Gold] by tomorrow to let him know what the story is and Gold will then advise [Ciochetti].”
On January 30, 1990, Gold’s secretary left a message for Ciochetti advising that “customer [National] to send payments to Graphics, Graphics will remit to us. Doesn’t know when payment is forthcoming.”
On January 31, 1990, Simone sent a letter to Gold which states in part:
Further to my letter of January 17, 1990, please be advised that the above lessee still remains in default.
We recently received a check from the lessee for $2,116.28 representing payment of the December 1 installment. Same has now been returned from our bank for insufficient funds. Therefore, the account is now due for December, January and February. As no other payments have been received, it appears unlikely that [National] will honor their obligations. Therefore, I am respectfully requesting that Graphics Leasing buy this transaction back as soon as possible.
By letter dated February 12, 1990, and mailed by regular mail at an unknown time, Harold Gold sent to SGFC’s San Francisco office three checks, numbered 1036, 1037, and 1039, each dated February 9, 1990, and each drawn on the account of I.T. Publications, Inc., on behalf of National. Gold, located in Waltham, Massachusetts, had received the checks from Graphics’ agent, Irv Ellis, in Phoenix, Arizona. Ellis had received the checks from Hunter Brashier, National’s president, located in Los Angeles.
Check nos. 1036,1037, and 1039 arrived in SGFC’s San Francisco office on February 22, 1990. Terri Ciochetti, the collector in that office, had no authority to make deposits on behalf of SGFC, so she routinely Federal Expressed to New York checks she received in San Francisco. On February 22 she Federal Expressed the three checks to SGFC’s New York office, which received them on February 23, 1990.
By letter dated February 16, 1990, Hunter Brashier advised SGFC’s San Francisco office that he had stopped payment on check nos. 1036, 1037 and 1039, instructed SGFC not to deposit these checks, and further advised SGFC that he was forwarding two replacement checks. On the same day, February 16, 1990, via Federal Express, National forwarded to SGFC in New York two post-dated checks: number 1060, dated February 22, 1990, in the amount of $2,116.28; and number 1061, dated February 23, 1990, in the amount of $2,116.33.
Checks nos. 1060 and 1061, which SGFC received in New York on February 17, 1990, were the first checks which SGFC received on National’s account after it received check no. 1031 on January 17, 1990.
SGFC instructs its collectors never to request postdated checks. However, if it receives such checks, its practice is to hold them until the date written on the check, and to deposit them on that date.
On February 22 and 23, 1990, SGFC, in New York, deposited check nos. 1060 and 1061, respectively, both of which cleared, for a total of $4,232.61.
Check number 1060, dated February 22, 1990, cleared on February 26, 1990, and was applied to the December 1, 1989 payment; check number 1061, dated February 23, 1990, cleared on February 27, 1990, and was applied to the January 1, 1990 payment.
On February 23,1990, after SGFC’s New York office received checks nos. 1036, 1037, and 1039 from Terri Ciochetti in SGFC’s San Francisco office, an SGFC employee in New York deposited them — apparently ignorant of the February 16 letter from Brashier advising that he had stopped payment on two of those checks. Thereafter, SGFC learned that National’s bank account was closed as ofFebruary 27, 1990. The three checks went unpaid.
SGFC never received the payment due as ofFebru-ary 1, 1990, nor any further payments pursuant to the Lease.
Between January 16 and February 15, 1990, Graphics had the financial capacity to pay to SGFC the amounts due from National under the Lease.
Between February 27 and August 1990, Simone of SGFC made at least fourteen telephone calls to representatives of National and Graphics, seeking payment under the Lease.
On March 23, 1990, Simone of SGFC sent a letter to Gold reporting that National’s account was past due for February and March 1990 payments. The letter states, “[unfortunately, unless [National] corrects the situation immediately, [SGFC] shall be forced to request repurchase by Graphics Leasing as per my letter of January 31, 1990.”
Domenica Simone, the author of the March 23, 1990 letter, had no authority to grant Graphics a waiver of its obligations under the Agreement.
In or about August 1990, SGFC’s investigator discovered National’s doors locked and found no sign of either National or the leased equipment. The investigator’s subsequent attempts to locate them were unsuccessful.
Pursuant to Article 7.5 of the Agreement, Graphics was obligated to use its best efforts to repossess and remarket the leased equipment.
RULINGS OF LAW
The principal issues in dispute are (1) whether Graphics cured National’s Early Default within the cure period under the Agreement, and thereby avoided *465 its obligation to repurchase the Lease; (2) whether, if Graphics failed to cure, SGFC by its subsequent conduct waived Graphics’ obligation to repurchase; and (3) whether SGFC failed to mitigate its damages.
The Agreement is governed by New York law.
A. Graphics’ Attempted Cure of National’s Early Default
Under Article 6.1(b) of the Agreement, SGFC must make its written request to repurchase “within sixty (60) days of the occurrence of an Early Default and Seller [Graphics] has thirty (30) days to cure the default. Seller shall repurchase the affected Paper . . . within ten (10) days of such repurchase request...” (emphasis in original).
The emphasized language, allowing Graphics thirty days in which to cure National’s Early Default, was inserted into SGFC’s form of agreement at Graphics’ request. It poses an inconsistency with the sentences which precede and follow it: Those sentences provide for a request to repurchase, to be followed within ten days by repurchase. The cure provision was inserted without amending the ten-day repurchase requirement so as to give Graphics the benefit of the thirty-day cure period. Nevertheless, the Agreement, read so as to give effect to the obvious intent of the parties, and so as to make it commercially reasonable, clearly contemplates that Graphics shall have thirty days to cure National’s default, failing which Graphics shall have an additional ten days within which to repurchase the Lease.
The next question raised by the Agreement is: Upon what event does the thirty-day cure period begin to run? Article 6.1(b), fairly read, provides that the cure period is the thirty days after the “written request for repurchase,” but does not specify whether the effective date of the request is the date on which it is sent, or the date on which it is received.
The Agreement signals the parties’ intention regarding the effective dates of notices. In Article 10.2, “Notices,” the parties agree that all “notices, requests and other communications hereunder shall be in writing and shall be deemed to have been given when delivered, if sent by messenger, or five (5) business days after mailing” by registered or certified mail. The listed methods of delivery result in constructive receipt not upon sending of the notice, but instead upon actual or presumed delivery to the recipient.
While regular mail undoubtedly is followed by a sparser paper trail than are registered and certified mail, there is no showing that the actual method or time of its delivery is any different. United States Postal Service regulations entered in evidence indicate that delivery by the third day after first class mailing “can be anticipated.”
Graphics does not contend, nor could it, that the January 8, 1990 request to repurchase was invalid because it was sent by first class mail. Graphics does contend, however, that the request was effective at the earliest on January 16, 1990, the fifth business day following January 8.
For purposes of determining the intent of the parties with regard to the effective date of a notice given by regular mail, I conclude that so long as the date of mailing is proven by a preponderance of the evidence, and in the absence of proof of the date of actual receipt, the notice will be effective under the Agreement on the fifth business day after mailing. Because SGFC has proved that the request to repurchase was mailed on January 8, 1990,1 rule that the thirty-day cure period began on January 16, 1990, and ran through February 15, 1990. Pursuant to the above interpretation of Article 6.1 (b), if Graphics did not cure by February 15, it was obligated to repurchase the Lease within ten days thereafter, i.e., by Monday, February 26, 1990.
Graphics argues that its obligation to cure was suspended for the fourteen-day period from January 24 to February 7, 1990, “because [SGFC] told Graphics that the default had been cured in its letter of January 17, and Graphics was unaware that the check was dishonored until it received [SGFC’s] letter dated January 31. Once Graphics learned that the instrument was dishonored, [SGFC’s] claim was revived.”[2] Defendant’s proposed ruling no. 7. Graphics relies on New York U.C.C. Section 3-802(l)(b), McKinney’s Vol. 62 1/2, arguing that it effectively tolls the statute of limitations for suit on a negotiable instrument for the period between tender of the instrument to the obligee, and subsequent dishonor of the instrument. See Defendant’s proposed ruling no. 4, and authorities cited. Graphics asserts that the thirty-day cure period in the Agreement “is similar to the running of the statute of limitations,” Defendant’s proposed ruling no. 3, and should similarly be tolled for so long as the obligation was suspended by tender of a check in payment. Defendant’s proposed ruling no. 8.
Graphics’ argument fails because a cure period is not equivalent to a statute of limitations. The latter is a time restriction imposed on the obligee; the former is a time restriction imposed on the obligor, in this case, Graphics. Tolling of the statute of limitations is allowed when actions of the obligor — e.g., tendering a check that is subsequently dishonored — cause the obligee to refrain from seeking to enforce the obligation. See U.C.C. §3-802, Official Comment 3, McKinney’s Vol. 62 1/2; see also Rukeyser v. Fountain & Choate, Inc., 173 N.Y.S. 21, 23 (A.D. 1918). Tolling— that is, extension — of a cure period, on the other hand, is not warranted where it results in rewarding the obligor for the tender of a check which, through no fault of the obligee, is subsequently dishonored.[3] Delivery and acceptance of a dishonored check do not constitute payment, U.C.C. sec. 2-511(3), McKinney’s Vol. 62 1/2. Therefore, SGFC’s receipt and deposit of check no. 1031 on January 17, 1990, and the subse *466 quent dishonor of that check, had no effect on the period in which Graphics was obligated to cure National’s default.
Alternatively, Graphics asserts that SGFC’s conduct merits an extension of the cure period. First, Graphics argues that, by “sending the letters by regular first class mail in violation of the Notice provision, [SGFC] evinced an intent that time was not of the essence.” Defendant’s proposed ruling no. 17. Second, Graphics argues that SGFC’s acceptance of the January 17, 1990 check, no. 1031, was a waiver of its repurchase demand. Defendant’s proposed ruling no. 22. Third, Graphics argues that SGFC showed no change in position by the delayed tender of payment, and that the Court should “intervene to prevent a forfeiture of a substantial interest despite a technical breach.” Defendant’s proposed ruling no. 19.
Graphics’ first argument ignores the obvious purpose of the Agreement’s repurchase provision: to provide an early warning mechanism allowing SGFC to tender a lease back to Graphics if a lessee shows, from the beginning, that its creditworthiness is suspect. Every action by SGFC between January 8 and February 15, 1990, is consistent with SGFC’s contention that it considered time to be of the essence.
Contract provisions specifying performance deadlines are to be strictly construed. Sparks v. Stich, 522 N.Y.S.2d 707, 709 (3rd Dept. 1987). The general rule of law is that the stipulated time of performance in executory contracts is of the essence unless a contrary intent appears. Lusker v. Tanner, 456 N.Y.S.2d 354, 357 (1st Dept. 1982).
SGFC showed no contrary intent in this case. As noted above, there is no evidence that regular mail, used by SGFC for each of its January 1990 letters to Graphics, is slower than certified or registered mail. Moreover, SGFC’s representatives communicated no fewer than ten times, by telephone or correspondence, with Graphics and National between January 8 and January 31,1990, regarding the status of the National account. These communications evinced SGFC’s desire that the account be brought current as soon as possible. Nor is there evidence of any statements by SGFC agreeing to extend Graphics’ (or National’s) performance: contrast GDJS Corp. v. 917 Properties Inc., 473 N.Y.S.2d 453, 455 (A.D. 1984), in which the obligee agreed to adjourn a closing, then attempted to declare the obligor in default.
To prevail on its second argument, waiver, Graphics must prove that SGFC intentionally abandoned a known right or advantage. United States v. Bedford Associates, 492 F.Supp. 851, 868 (S.D.N.Y. 1980). Waiver is conduct that leads a party to believe that the strict rights under a contract will not be insisted on. Orlik Ltd. v. Helme Products, Inc., 427 F.Supp. 771, 775 (S.D.N.Y. 1977).
In assessing the waiver defense it is important to distinguish, as Graphics does not, between the two separate obligations which SGFC sought by its January 1990 communications to enforce: the obligation of National to make payments on the Lease so long as SGFC owned it; and the obligation of Graphics either to cure National’s default, or to repurchase the Lease from SGFC. There is nothing inconsistent, or misleading, in SGFC’s efforts to collect payments on the Lease (before or after the February 15 cure deadline), or in its acceptance of check no. 1031, while it waited to see whether Graphics would cure or repurchase. Obviously, payment of good funds within the cure period would have satisfied both National’s and Graphics’ obligations to SGFC; but SGFC cannot be faulted, or held to have misled Graphics, by its persistent efforts to collect on an account which Graphics had failed to repurchase as requested. SGFC’s acceptance of National’s check no. 1031 was consistent not with a waiver of its repurchase demand, but with its right to seek payment from National.[4] See Towers Charter & Marine Corporation v. Cadillac Insurance Company, 894 F.2d 516, 522 (2nd Cir. 1990) (applying New York law).
Finally, the equities of this case do not justify intervention “to prevent a forfeiture of a substantial interest despite a technical breach,” as argued in Graphics’ proposed ruling no. 19. Even if Graphics did not learn of the dishonor of check no. 1031 until February 7, 1990, it had until February 15 to cure the default by paying, from its own funds, the $2,116.28 due. Graphics had the financial resources to do so. Instead, Graphics’ president, Harold Gold, obtained checks from National and forwarded them to SGFC under cover of his letter dated February 12.
The above findings amply demonstrate that Gold’s reliance on National’s questionable solvency to satisfy Graphics’ own obligation to cure was misplaced: SGFC did not receive its first payment on the Lease until February 22, 1990, seven days after the cure period had expired. It cannot be said here, as it could in J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc., 397 N.Y.S.2d 958, 961 (Ct.App. 1977), that the obligee is not harmed by a delay in the obligor’s performance. Graphics, not SGFC, should bear the consequences of National’s failure to pay.
Accordingly, I rule that Graphics failed to cure within the cure period provided by the Agreement, and was therefore obligated to repurchase the Lease, which it failed to do.
B. Waiver by SGFC After February 15, 1990
Graphics argues that after the cure period expired, SGFC waived Graphics’ obligation to repurchase. Specifically, Graphics asserts that SGFC’s acceptance of checks nos. 1060 and 1061, received by SGFC on February 17,1990 (and post-dated to February 22 and 23, respectively), and of checks nos. 1036, 1037, and 1039, received by SGFC on February 22, 1990, constituted a waiver of its repurchase demand. Graphics argues that such acceptance was inconsistent with the *467 intent to enforce SGFC’s rights, especially where the checks were post-dated, an earlier check had been twice dishonored, and the cure period had expired. Defendant’s proposed rulings nos. 21-23.
The discussion above regarding SGFC’s conduct prior to February 15, 1990 applies with equal force here: SGFC’s acceptance of checks from National was consistent with SGFC’s desire to enforce National’s payment obligations under the Lease for so long as Graphics failed to repurchase as required by the Agreement. SGFC’s conduct therefore was not inconsistent with the intent to enforce its rights. Cf. T.G.I. East Coast Construction Corp. v. Fireman’s Fund Insurance Co., 600 F.Supp. 178, 181 (D.C.N.Y., 1985).
Graphics also argues that the parties’ mutual efforts to obtain payment from National, following the expiration of the cure period, constituted a “mutual waiver of the cure deadline.”[5] Graphics relies on Empire National Bank v. United Penn Bank, 439 N.Y.S.2d 203 (A.D. 1981), a contract case in which the defendant contended that plaintiff had failed to fulfill its contractual obligation to “close” the agreement within the time limited thereby. The Court affirmed summary judgment for plaintiff, finding defendant’s argument insufficient “since the only evidence submitted on the issue reveals a mutual waiver of the 30-day requirement through the continuing efforts of both parties, without protest, to conclude the agreement well after the contractual time period had expired.” Id. at 204.
Empire National Bank is inapposite because there the parties’ conduct (continued efforts to conclude the agreement) was consistent with a single intent: extending the time limit so that the agreement could be concluded. Here, as noted above, the efforts of SGFC and of Graphics were more consistent with the intent to respond to the commercial reality that Graphics had neither cured nor repurchased, and that National remained behind in its account.
Specifically, the efforts of SGFC were consistent with obtaining payment from National for so long as Graphics failed to repurchase, as it had become obligated to do on February 26, 1990. Graphics’ efforts to assist collection were consistent with the dim hope that National might establish its creditworthiness and give Graphics a basis for persuading SGFC ultimately to waive Graphics’ repurchase obligation and to stick with the National Lease. When National disappeared, so did the potential for a waiver. In the meantime, Graphics was not prejudiced by SGFC’s collection efforts: Had SGFC washed its hands of the Lease on February 26, 1990, and looked to Graphics to collect payments from National, there is no reason to conclude that National would thereafter have been any more willing, or able, to pay Graphics than it was to pay SGFC.
Finally, Graphics cites SGFC’s March 23, 1990 letter as evidence of conduct inconsistent with, and therefore a waiver of, SGFC’s rights. In that letter, Ms. Simone of SGFC states that, “unless [National] corrects the situation immediately, [SGFC] shall be forced to request repurchase by Graphics Leasing as per my letter of January 31, 1990.”
Ms. Simone’s letter is ambiguous insofar as it refers to requesting of repurchase “as per my letter of January 31, 1990.” In that letter, Simone had repeated the request SGFC had first made January 8. In all the circumstances, I construe Simone’s March 23 letter either as an attempt further to cajole Gold to pressure National to pay its account, or as an inartful repetition of SGFC’s earlier request that Graphics repurchase the Lease. Cf. New England Telephone Co. v. Jamestown Telephone Corp., 282 N.Y. 365, 372 (Ct.App. 1940).
Even if the March 23 letter were to be read as a waiver of any previous request that Graphics repurchase the Lease, Simone did not have the authority to make such a waiver on SGFC’s behalf. In any event, Article 10.3 of the Agreement provides that “[n]o failure on the part of either party to exercise, and no delay in exercising, any right hereunder . . . shall operate as a waiver thereof.”
Accordingly, I rule that SGFC did not waive Graphics’ obligation to repurchase the Lease.
C. Mitigation of Damages
Graphics asserts that SGFC failed to mitigate its damages by failing to make reasonable efforts to repossess and sell National’s equipment. SGFC makes three responses: (1) SGFC did make reasonable efforts. It hired an investigator who located the equipment at National’s place of business; when the investigator arrived, however, the equipment and National were gone. (2) It was Graphics, not SGFC, which was obligated to repossess the equipment. Article 7.5 of the Agreement (“Remarketing”) provides that, upon a lessee’s default, Graphics is obligated to “repossess and remarket the equipment.” (3) Even if the equipment had been recovered, it had negligible resale value.
The Court agrees with the first two of SGFC’s responses, based upon the above findings and the terms of the Agreement. It does not consider the third, as to which the evidence from both sides was speculative.
Accordingly, I rule that SGFC did not fail to mitigate its damages.
ORDER FOR JUDGMENT
For the reasons stated above, it is hereby ORDERED that judgment shall enter for plaintiff on Count I of the Complaint. The matter shall be scheduled for an assessment of damages.

 Article 6.1(b) reads: “. . . Seller shall be obligated, upon written request of SGFC, to repurchase any Paper purchased by SGFC hereunder with respect to which Paper, if such Paper is Aged Paper, any one or more of the first three (3) periodic payments, or if such Paper is New Paper the first periodic *468 payment, due to SGFC from the Obligor subsequent to purchase of such Paper by SGFC Is thirty (30) or more days past due (in either case, an ‘Early Default’). Such written request for repurchase shall be made by SGFC within sixty (60) days of the occurrence of an Early Default and Seller has thirty (30) days to cure the default. Seller shall repurchase the affected paper . . . within ten (10) days of such repurchase request . . ." (Emphasis in original.) The emphasized cure provision was inserted at the request of Graphics’ president, Harold Gold.

 It should be noted that the January 17, 1990 letter from SGFC does not state that National’s default had been “cured.” On that date both parties knew that SGFC had received a check, but did not know whether the check would be honored.

 Nor does the Agreement itself provide for any extension of the cure period.

 This case is thus distinguishable from Burnett v. Vance, 483 N.Y.S.2d 595, 597 (Sup. 1984), in which a seller of real property accepted a third-party check, unindorsed by buyer, at the closing, and was held to have agreed to receive the check as unconditional payment of the purchase price. In this case the third party (National), unlike the third party in Burnett, had an independent obligation to the payee, SGFC.

 To the extent that this argument suggests an oral modification of the Agreement, the argument founders on Article 10.1, which provides that the Agreement “shall not be modified or amended except in writing ...” That provision is valid. N.Y. Gen. Oblig. Law §15-301(1), McKinney’s Vol. 23A; see Chemical Bank v. Wasserman, 371 N.Y.S.2d 919, 920 (1975). The exceptions outlined in Towers Charter & Marine Corporation v. Cadillac Insurance Company, supra at 522, are not pertinent in this case, where there was neither an oral modification, nor partial performance or justifiable reliance referable to any oral modification.