F I L E D
United States Court of Appeals
Tenth Circuit

FEB 24 2003

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

SALT LAKE TRIBUNE PUBLISHING
COMPANY, LLC,

    Plaintiff - Appellant,

and

JAMES E. SHELLEDY, as editor and
administrator of news gathering for The
Salt Lake Tribune; THE SALT LAKE
CITY WEEKLY; KUTV; KUTV
HOLDINGS; KTVX-TV; CLEAR
CHANNEL COMMUNICATIONS,

    Plaintiffs - Intervenors,

v.

AT&T CORPORATION; AT&T
BROADBAND & INTERNET
SERVICES, LLC; DESERET NEWS
PUBLISHING COMPANY;
MEDIANEWS GROUP, INC.; and
KEARNS-TRIBUNE, LLC,

    Defendants - Appellees,

No. 02-4126 & 02-4165

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:00-CV-936-ST)

Seth P. Waxman, Wilmer, Cutler & Pickering, Washington, D.C., (A. Stephen Hut, Jr., Patrick J. Carome, Jennifer M. O'Connor, Rachael A. Hill, Luke A. Sobota, Wilmer, Culter & Pickering, Washington, D.C.; Gary F. Bendinger, Milo Steven Marsden, Jeffrey S. Williams, Lisa R. Petersen, Bendinger, Crockett, Peterson & Casey, Salt Lake City, Utah; Daniel M. Reilly, Barbara Z. Blumenthal, Sean Connelly, Hoffman, Reilly, Pozner & Williamson LLP, Denver, Colorado, with him on the briefs) for Plaintiff-Appellant.

Kevin T. Baine, Williams & Connolly LLP, Washington, D.C. and David J. Jordan, Stoel Rives, Salt Lake City, Utah, (Victoria Radd Rollins, Paul B. Gaffney, Jennifer G. Wicht, Katherine P. Chiarello, Williams & Connolly LLP, Washington, D.C.; James S. Jardine, Allan T. Brinkerhoff, Ray, Quinney & Nebeker, Salt Lake City, Utah; Jill M. Pohlman, Stoel Rives, Salt Lake City, Utah; Alan L. Sullivan, Todd M. Shaughnessy, Snell & Wilmer LLP, Salt Lake City, Utah, with them on the briefs) for Defendants-Appellees.

---

Before **TACHA**, Chief Judge, **EBEL**, and **O'BRIEN**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

The parties in this case are involved in a continuing fight over the ownership and control of The Salt Lake Tribune, the largest newspaper in Utah. The principal shareholders of the plaintiff, Salt Lake Tribune Publishing Co. ("Tribune Publishing"), once owned The Tribune, and Tribune Publishing sued the defendants seeking enforcement of a contract giving it an option to purchase the assets of the newspaper. MediaNews Group ("MediaNews"), through its wholly owned subsidiary Kearns-Tribune LLC ("KTLLC"), is the current owner of the assets of The Tribune, and KTLLC and MediaNews have defended against

- 2 -

the lawsuit by arguing that Tribune Publishing's option contract to repurchase the assets of The Tribune is unenforceable. Deseret News Publishing Co. ("Deseret News"), which is owned by the Church of Jesus Christ of Latter-Day Saints and publishes the newspaper that is The Tribune's chief competitor in Salt Lake City, has joined the action claiming that a separate contract between it and KTLLC—a Joint Operating Agreement pursuant to which KTLLC and Deseret News share certain newspaper business operations—forecloses Tribune Publishing's ability to enforce performance of its option contract against KTLLC.

This case has not yet reached trial. Before us is Tribune Publishing's appeal of the district court's denial of its request for a preliminary injunction. The injunction sought would have allowed Tribune Publishing to continue managing The Tribune, which it had been doing since 1997 under a management agreement with KTLLC that expired on July 31, 2002. Related to our review of the denial of the preliminary injunction is the question certified for appeal by the district court pursuant to 28 U.S.C. § 1292(b), and appealed by Tribune Publishing, of whether a provision of the Joint Operating Agreement purporting to prohibit the transfer of certain stock is void as against public policy. We have jurisdiction pursuant to 28 U.S.C. §§ 1292(a)(1) and 1292(b).

In resolving these appeals, we make four principal rulings. First, we conclude that the stock transfer restriction in the JOA is valid and enforceable

- 3 -

under Utah law. Second, we conclude that the district court has subject matter jurisdiction over the case. Third, we hold that the district court did not abuse its discretion in denying Tribune Publishing's motion for a preliminary injunction. Fourth, despite these three rulings, we conclude that there is a substantial likelihood that Tribune Publishing will prevail at trial on the merits of its claim of the right to acquire the assets of The Tribune. We therefore reverse the district court's holding to the contrary, which was relied upon as an alternative ground for denying the preliminary injunction motion.

Accordingly, we **AFFIRM** in part and **REVERSE** in part the district court's order denying the preliminary injunction.

### BACKGROUND

In 1997, The Salt Lake Tribune was owned by the Kearns-Tribune Corporation, the principal shareholders of which were members of the Kearns-McCarthey family. Members of the family, descendants of Utah mining magnate and U.S. Senator Thomas Kearns, had owned and published The Tribune for more than a century. In April 1997, however, the shareholders of the Kearns-Tribune Corporation decided to sell Kearns-Tribune Corporation to cable company Tele-Communications, Inc. ("TCI"), while receiving an option to repurchase the assets of The Tribune at a later date. The transaction was motivated by the shareholders' desire to realize the economic value of what had become Kearns-

Tribune Corporation's most valuable asset—approximately $400 million in TCI stock—while preserving control over and ultimately reacquiring the assets of The Tribune by the Kearns-McCarthey family.

To achieve these objectives, members of the Kearns-McCarthey family formed the plaintiff company, Tribune Publishing. Contemporaneously with the sale of Kearns-Tribune Corporation to TCI, Tribune Publishing negotiated two contracts with Kearns-Tribune Corporation: a Management Agreement and an Option Agreement. The Management Agreement appointed Tribune Publishing as the exclusive agent of Kearns-Tribune Corporation to manage and operate The Tribune for a period of five years ending on July 31, 2002. This Agreement provided for automatic renewal unless it was terminated by one of the parties. The Option Agreement gave Tribune Publishing the right "to purchase all, and not less than all . . . of the assets used, held for use or usable in connection with the operation and publication of The Salt Lake Tribune." The first date upon which the option could be exercised was August 1, 2002, five years after the date of the execution of the Option Agreement.

Two aspects of the exercise date of the Option Agreement are important to this case. First, the earliest date for exercise of the option (August 1, 2002) was one day after the expiration of the Management Agreement (July 31, 2002), should one of the parties to the Management Agreement terminate that agreement

before it was automatically renewed.  Second, upon exercise of the option by Tribune Publishing, the Option Agreement provides for an interim period prior to the closing of the option transaction of up to 120 days, during which the parties may use a specified appraisal process to determine the exercise price of the option.  Because there is no necessary overlap between the termination date of the Management Agreement and the closing date for the purchase of the Tribune Assets under the Option Agreement, there was always the potential for Tribune Publishing to be ousted as manager of The Tribune even as it was preparing to buy the assets of the newspaper.

This possibility has now occurred.  In January 2002, KTLLC notified Tribune Publishing that it was terminating the Management Agreement.  The Management Agreement therefore expired on July 31, 2002, and KTLLC assumed control of The Tribune.  Then, on August 1, 2002, Tribune Publishing notified KTLLC that it was exercising its option to purchase the Tribune Assets.  Tribune Publishing is thus no longer the manager of The Tribune even as it seeks to enforce its option to buy the assets of The Tribune.

This state of affairs is due, at least in part, to transactions that occurred after Kearns-Tribune Corporation was bought by TCI.  In 1999, TCI merged with AT&T Corporation, giving AT&T control over Kearns-Tribune Corporation.  As part of the TCI-AT&T merger, Kearns-Tribune Corporation became a limited

liability company, Kearns-Tribune LLC (hereinbefore designated as KTLLC), and assumed all of the rights and responsibilities of Kearns-Tribune Corporation. AT&T thereafter sold KTLLC to MediaNews, its current owner, in 2001. It was the prospect of the sale of KTLLC to MediaNews that prompted Tribune Publishing to begin this litigation by filing a complaint against AT&T in the United States District Court for the District of Utah in December 2000. The complaint alleged that the sale of KTLLC to MediaNews would interfere with Tribune Publishing's rights under the Option Agreement and it sought injunctive and declaratory relief and damages.

The district court did not stop AT&T's sale of KTLLC to MediaNews, in part because the sale documents recognized and preserved Tribune Publishing's rights under the Option and Management Agreements. MediaNews bought KTLLC, which as noted above owned The Tribune, for $200 million in January 2001. Despite the sale of KTLLC, the litigation continued. Tribune Publishing has amended its complaint several times since then, and it currently seeks damages from and injunctive relief against MediaNews, KTLLC, and Deseret News for, among other things, breach of contract, interference with prospective economic relations, and breach of the duty of good faith and fair dealing.[1]

---

[1]On March 27, 2002, the district court granted AT&T's Motion to Dismiss or for Summary Judgment, thereby dismissing some of the claims against AT&T
(continued...)

As the termination date of the Management Agreement approached (July 31, 2002), Tribune Publishing moved for a preliminary injunction that would prevent MediaNews or KTLLC from ousting Tribune Publishing as manager of The Tribune. The district court denied that motion on July 22, 2002, nine days before the termination date. Tribune Publishing filed a notice of appeal on the same day that its motion was denied, and then sought an injunction pending appeal both from the district court and this court. Both of those requests were denied, and we ordered that the case be briefed and argued on an expedited basis.

## DISCUSSION

## I. THE CERTIFIED QUESTION

We address first the question certified for appeal by the district court pursuant to 28 U.S.C. § 1292(b) because our answer affects the resolution of other issues in the case.[2] The question certified for our review is whether a certain provision of a contract between KTLLC and Deseret News is void as against public policy.

---

[1](...continued)
and granting summary judgment in favor of it on the others.

[2]In Part II we address subject matter jurisdiction. We place that discussion after this analysis of the certified question only because certain of our conclusions here are necessary predicates to our later conclusions on subject matter jurisdiction.

In 1952, Deseret News and the predecessor in interest of KTLLC entered into the Joint Operating Agreement ("JOA"), the purpose of which was to share overhead expenses related to the production of The Salt Lake Tribune and the Deseret News.[3]  The JOA created the Newspaper Agency Corporation (NAC) to be the agent of KTLLC and Deseret News.  The NAC is charged under the JOA with conducting the printing, advertising, distribution, and billing activities of both newspapers; the newsgathering and editorial functions of each paper were kept strictly separate under the agreement.  KTLLC and Deseret News each own 50% of the stock in the NAC, and an amended form of the agreement remains in force today.

The JOA carefully delineates the scope of the NAC's operations as the agent of both Deseret News and KTLLC, and it specifies how the parties are to nominate and elect their representatives to the management of the NAC.  In addition, and most relevant for present purposes, the JOA contains a provision purporting to prohibit the transfer by KTLLC or Deseret News of their ownership of the NAC stock to anyone else.  This is the provision we must review and that Tribune Publishing argues is void because it is contrary to the public policy of

[3]In order to preserve multiple editorial voices in a given market and assist financially distressed newspapers, Congress encouraged the formation of JOAs by giving them a limited exception to the antitrust laws.  See Newspaper Preservation Act, 15 U.S.C. §§ 1801–1804.

Utah. We hold that the stock transfer restriction is valid and enforceable and not in violation of Utah public policy.

The restriction on the transfer of NAC stock is contained in Section 2 of the JOA. It says:

> STOCK RESTRICTIONS. The parties hereto [KTLLC & Deseret News] shall continue the operations of the Agency Corporation [NAC] and <u>shall not assign, sell, transfer, mortgage, pledge or otherwise dispose of their stock in the Agency Corporation nor voluntarily permit alienation thereof by any means during the term of this Agreement or any renewal thereof</u>, and such stipulation shall remain printed on the face of the stock certificates heretofore issued to the parties hereto as aforesaid, or any stock certificate representing shares of the Agency Corporation hereafter issued.

1982 JOA § 2, at 3 (emphasis added).

This restraint on the transfer of NAC stock is relevant to the instant case because the defendants argue that it defeats Tribune Publishing's claim for specific performance of the Option Agreement. The defendants contend that the district court cannot issue a decree ordering KTLLC to transfer the NAC stock to Tribune Publishing because such an order would cause KTLLC to breach Section 2 of the JOA and, therefore, the order would be contrary to principles of equity. In fact, the defendants go further, arguing that because the obligation not to transfer the NAC shares existed before the Option Agreement, the Option Agreement is void because it conflicts with KTLLC's prior obligations under the JOA.

The district court considered the validity of the stock transfer restriction in its Order on Motions for Summary Judgment. In that order, the district court characterized the stock transfer restriction in the JOA as "an absolute prohibition against the transfer of the stock by assignment, sale or otherwise." Order on Motions for Summary Judgment, May 31, 2002, at 5. The court ruled that the stock transfer restriction is valid and enforceable under Utah law, but also concluded that it does not affect the validity of the Option Agreement. The district court therefore entered summary judgment in favor of Tribune Publishing on the issue of the validity and enforceability of the Option Agreement. However, although the district court concluded that the valid transfer restriction in the JOA did not void the Option Agreement, it also ruled that the stock transfer restriction is an obstacle to Tribune Publishing's claim for specific performance of the Option Agreement and denied Tribune Publishing summary judgment on that issue.

The validity of the stock transfer restriction is "an issue of law that is controlling in this case" because it affects the form of relief to which Tribune Publishing may be entitled. Order Certifying Issue Pursuant to 28 U.S.C. § 1292(b), Aug. 21, 2002, at 3. Finding that the criteria governing the certification of issues for interlocutory appeal under 28 U.S.C. § 1292(b) had been met, the district court <u>sua sponte</u> certified for appeal the question whether the restraint on

the alienation of NAC stock contained in Section 2 of the JOA is void as against

public policy. (Id. at 2–3.) Because this issue is a pure question of law, we

review it de novo. Dang v. UNUM Life Ins. Co. of Am., 175 F.3d 1186, 1189

(10th Cir. 1999).

## A.  Utah's Public Policy

In analyzing arguments invoking public policy to interpret contracts under

Utah law, we are "mindful of Utah's practice of interpreting public policy very

narrowly." Am. Airlines v. Christensen, 967 F.2d 410, 414 (10th Cir. 1992).

Utah recognizes that "the theory of public policy embodies a doctrine of vague

and variable quality, and, unless deducible in the given circumstances from

constitutional or statutory provisions, should be accepted as the basis of a judicial

determination, if at all, only with the utmost circumspection." Berube v. Fashion

Centre, Ltd., 771 P.2d 1033, 1043 (Utah 1989) (quoting Patton v. United States,

281 U.S. 276, 306 (1930)).

We find that Utah's public policy with respect to stock transfer restrictions

has been expressed by Utah's legislature in a statute. Section 16-10a-627 of the

Utah Code states:

> **Restrictions on transfer or registration of shares or other securities.**
> (1) The articles of incorporation, the bylaws, an agreement among shareholders, or an agreement between one or more shareholders and the corporation may impose restrictions on the transfer or registration of transfer of shares of the corporation. . . .

- 12 -

. . . .
    (3) A restriction on the transfer . . . of shares is authorized:
        (a) to maintain the corporation's status when it is
dependent on the number or identity of its shareholders;
        (b) to preserve entitlements, benefits, or exemptions
under federal, state, or local laws; and
        (c) <u>for any other reasonable purpose</u>.

Utah Code Ann. § 16-10a-627 (2001) (emphasis added).

There are no reported cases interpreting the relevant provisions of § 16-10a-627, but the assistance of such cases is not necessary where, as here, the terms of the statute are clear. Through the statute, Utah plainly embraces the validity of stock transfer restrictions. According to § 16-10a-627(3)(c), a stock transfer restriction is authorized in Utah as long as the transfer restriction serves a "reasonable purpose." The only issue we must resolve as to the certified question, therefore, is whether the stock transfer restriction contained in Section 2 of the JOA is designed to serve a reasonable purpose.

The obvious purpose of the stock transfer restriction in the JOA is to prevent any other entities besides KTLLC and Deseret News from participating in control of the NAC. Section 7 of the JOA says that the stock ownership in the NAC "is solely for the purpose of dividing the control of the Agency Corporation between [the parties]." 1982 JOA § 7, at 13. By limiting stock transfers, therefore, the parties intended to restrict who can control the NAC.

The desire to limit the participation of outsiders in a close corporation like the NAC has long been recognized as a reasonable purpose for a share transfer restriction. When Chief Justice Holmes was still a judge on the Supreme Judicial Court of Massachusetts, he wrote:

> Stock in a corporation is not merely property. It also creates a personal relation analogous otherwise than technically to a partnership. . . . [T]here seems to be no greater objection to retaining the right of choosing one's associates in a corporation than in a firm.

Barrett v. King, 63 N.E. 934, 935 (Mass. 1902); see also Castriota v. Castriota, 633 A.2d 1024, 1027 (N.J. Super. Ct. App. Div. 1993) ("[T]he courts have recognized that stock in a small corporation is not merely property, that it also creates a personal relation analogous to a partnership and that the owners have reason to prevent unacceptable outsiders from acquiring an interest in the entity."). One commentator has summarized this point in a way particularly applicable to the intimate relationship that exists between the shareholders of the NAC:

> The particular significance of the "close" character of a corporation . . . lies very clearly in the fact that such a [share transfer] restriction is inherently more "reasonable" when applied to the stock of a corporation having only a few shareholders who are generally active in the business . . . than when imposed upon the stock of a corporation which has numerous shareholders who . . . do not participate actively in the day-to-day management and conduct of the corporation's affairs.

J.R. Kemper, Annotation, <u>Validity of "Consent Restraint" on Transfer of Shares of Close Corporation</u>, 69 A.L.R.3d 1327 (1976).

The reasonableness of the purpose of the JOA's stock transfer restriction is more evident when considered in the special context of the NAC. As shareholders in NAC, KTLLC and Deseret News did not, as shareholders traditionally do, merely provide capital to fund an entity that would pursue its own independent business existence. They created the NAC expressly for the purpose of having it act as <u>their agent</u>. 1982 JOA § 7, at 13 ("The sole purpose and function of the Agency Corporation shall be to act as agent of the parties hereto in the printing, advertising, solicitation and distribution of their respective papers . . . ."). It was designed to serve the operational business needs of the two shareholders' pre-existing businesses, <u>The Salt Lake Tribune</u> and the <u>Deseret News</u>. Indeed, the NAC is authorized <u>only</u> to serve the needs of those two specific newspapers. We agree with the district court's observation that Section 2 of the JOA "reflects the unique position of the parties to the JOA, and the fact that they jointly own assets and are interdependent upon each other for the success in the publishing, advertising and distribution of their respective papers." Order on Motions for Summary Judgment, May 31, 2002, at 5.

Here the relationship between the shareholders and the corporation is that of principal and agent. <u>See</u> <u>Mecham v. Consol. Oil & Transp., Inc.</u>, 53 P.3d 479,

- 15 -

483 (Utah Ct. App. 2002) ("[A]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.") (internal quotation marks and citation omitted). And principals are subject to liability for the acts of their agents that are within the scope of the agent's authority. See Forsyth v. Pendleton, 617 P.2d 358, 360 (Utah 1980) ("[T]he general principle of the law of agency is that principals are bound by the acts of their agents which are within the apparent scope of the authority of the agent . . . ."). The arrangement here is therefore starkly different from the one that shareholders enjoy in the usual relationship between shareholders and a corporation where shareholders are protected by limited liability. In this unusual circumstance, we do not hesitate to conclude that the purpose of the share transfer restriction in the JOA is reasonable and that its scope is appropriately tailored to achieve that purpose. It therefore is authorized by § 16-10a-627 of the Utah Code and is not contrary to that state's public policy.

Although Tribune Publishing concedes that "reasonable restraints on alienation are sustainable," Tribune Publishing argues that the restraint at issue here is an "absolute prohibition on alienation of stock" and that such restraints can never be reasonable. In support of this contention, Tribune Publishing makes several arguments. We find none of them convincing.

First, Tribune Publishing points to a number of cases that, it says, uniformly establish that absolute prohibitions on share transfers are against public policy. See, e.g., Castriota v. Castriota, 633 A.2d 1024, 1028 (N.J. Super. Ct. App. Div. 1993) ("[a] restraint against alienation [that] is total and absolute . . . [is] void as against public policy"); Witte v. Beverly Lakes Inv. Co., 715 S.W.2d 286, 291 (Mo. Ct. App. 1986) ("absolute restriction on [stock] transfer is unreasonable per se and void"); Quinn v. Stuart Lakes Club, Inc., 443 N.E.2d 945, 945 (N.Y. 1982) ("an absolute restraint on the power of alienation violat[es] the public policy in this State"). Even if the holdings of these cases from other jurisdictions at one time could have been imported into the common law as it exists in Utah, they are no longer relevant. Section 16-10a-627 of the Utah Code expressly authorizes share transfer restrictions that have a reasonable purpose, and any more restrictive common law rule is overridden by this statute.[4] See, e.g., Utah v. Harvey Real Estate, 57 P.3d 1088, 1092 (Utah 2002) (holding that a statute preempts common law principles to the extent they are inconsistent with the statute); Gottling v. P.R. Inc., 61 P.3d 989, 991 (Utah 2002) ("We have long held that where a conflict arises between the common law and a statute or constitutional law, the common law must yield . . . because the common law

_____

[4]Section 16-10a-627 of the Utah Code was enacted in 1992. Act effective July 1, 1992, ch. 277, § 53, 1993 Utah Laws.

cannot be an authority in opposition to our positive enactments.") (internal quotation marks and citations omitted); Hansen v. Utah State Ret. Bd., 652 P.2d 1332, 1337–38 (Utah 1982) (same). The rule that Tribune Publishing urges upon us—any "absolute prohibition" on share transfers is per se void—contradicts the Utah statute by foreclosing those, perhaps rare, absolute restraints on share transfers that are reasonable. The Utah statute permits restrictions with any reasonable purpose, which require a reasonableness inquiry and not a per se rule when evaluating a share restriction.

The one case that Tribune Publishing cites dealing with Utah law, Shumaker v. Utex Exploration Co., 157 F. Supp. 68, 72 (D. Utah 1957), is inapposite because it, too, is trumped by the later-enacted statute. See Farmers Ins. Exch. v. Call, 712 P.2d 231, 235 (Utah 1985) (overruling precedent because a later-enacted statute established the public policy that the precedent had rejected). In Shumaker, the court considered the validity of a corporate bylaw giving the corporation a right of first refusal to purchase shares being sold by stockholders. The court upheld that share transfer restriction, relying on reasoning that is consistent with the outcome we reach in this case under the Utah statute. The court found that the restriction was reasonable in relation to the interests of the corporation and "[r]easonable restrictions on the sale of corporate stock are now generally approved." Id. at 73.

The portion of the Shumaker opinion relied upon by Tribune Publishing is not persuasive authority. The language Tribune Publishing cites from Shumaker to support its position—"a corporate bylaw which prohibits the alienation of the stock of the corporation is void," id. at 72—is a quote from an out-of-date A.L.R. commentary and is dicta because it was not relied upon to resolve the case.

Second, we also are not convinced that the stock transfer restriction in the JOA is the "absolute prohibition on alienation" that Tribune Publishing claims it is. Tribune Publishing has itself apparently always understood the transfer restriction as acting functionally as a consent requirement and not as an absolute prohibition against alienation. For example, on at least one occasion the parties expressly waived the requirements of Section 2 for stock transfers early in the history of the JOA in order to provide, pursuant to then-prevailing law, qualifying shares for individuals who served as directors, and Tribune Publishing's general counsel testified that the Tribune Publishing board of directors was aware that Deseret News potentially had a right to refuse to consent to a transfer of KTLLC's NAC stock. Tribune Publishing's outside transactional counsel also observed that "[t]he joint operating agreement has a consent right in it. It's obvious on the face of the document." 10B Appellant's App. at AA2978.

Even without considering the past conduct and understanding of the parties, the transfer restriction cannot be said to be absolute in any functional sense.

Ultimate ownership of the NAC stock can always be transferred simply by changing the ownership of the shareholding entity (KTLLC or Deseret News) while leaving in the shareholding entity legal title to the NAC shares. In this case alone, ownership of the NAC stock has been effectively transferred four times: from Kearns-Tribune to TCI to AT&T to MediaNews. Thus, to transfer NAC stock requires as a practical matter only the transfer of the ownership interests in KTLLC or Deseret News. Even if KTLLC owned assets in addition to the NAC stock that its owners did not want to transfer, it need only shift those assets out of KTLLC into a separate entity and then transfer the ownership of KTLLC in order effectively to transfer the NAC stock.[5] The point is that any willing seller and willing buyer can effectuate a transaction that transfers ultimate control of NAC stock regardless of the desire of Deseret News to enforce the transfer restriction.[6] Indeed, Tribune Publishing recognizes the ease with which such transfers can occur as it relies on this fact in arguing that the transfer restrictions are no

---

[5]We recognize that it would not be as simple to transfer the ownership interest in KTLLC if it were a public corporation or had many shareholders. On the facts of this case, however, where KTLLC has a single, private owner and KTLLC has only one line of business, the JOA's restrictions operate differently—less restrictively—than they would if KTLLC had many shareholders or were a large and diversified business.

[6]If MediaNews so desired, it could transfer ownership of KTLLC to Tribune Publishing, and with it all of the Tribune Assets, without implicating in any way Deseret News's right to enforce Section 2 of the transfer restriction in the JOA.

obstacle to an award of specific performance.  The operation of Section 2 over time and the parties' own expressed understanding of it belies Tribune Publishing's assertion that it "forbids all transfers."

Third, the public policy underlying the rule that Tribune Publishing advocates is not offended by the JOA's stock transfer restriction.  One reason courts have given for finding that absolute restraints on alienation are against public policy is that such provisions constitute an unreasonable incursion on the free flow of commerce.  See, e.g., Witte, 715 S.W.2d at 290 ("[R]estraints on alienation were, on principle, repugnant to a free economy.").  But the experience in this case shows that the JOA's stock transfer restriction is not at all an obstacle to the free flow of commerce.  Although legal title to the NAC shares has resided with KTLLC or its predecessors in interest during the period relevant to this case, KTLLC or its predecessor in interest effectively has been sold three times within a four-year period: from Tribune Publishing to TCI (1997), from TCI to AT&T (1999), and from AT&T to MediaNews (2001).  One might argue that the impediment to commerce created by the share transfer restriction in the JOA is to the sale of The Salt Lake Tribune itself and not the sale of KTLLC.  But under the circumstances of this case, there is no difference between the two.  KTLLC is nothing more than a holding company for the Tribune assets.  To own KTLLC is to own the Tribune.  It is blind adherence to an empty formalism to insist that the

- 21 -

stock transfer restriction in the JOA obstructs commerce by preventing the sale of the Tribune when the newspaper is controlled by whoever owns KTLLC and the identity of that owner has changed repeatedly.

Finally, Tribune Publishing argues that even if we interpret the statute as we do—that it permits all reasonable stock transfer restrictions—what is "reasonable" under the statute is limited by the principle of ejusdem generis. "[That] doctrine declares that in order to give meaning to [a] general term [in a statute], the general term is understood as restricted to include things of the same kind, class, character, or nature as those specifically enumerated, unless there is something to show a contrary intent." Utah v. A.T., 34 P.3d 228, 232 (Utah 2001). Tribune Publishing argues that if this principle is applied to the Utah statute, the statute cannot be read to authorize the share transfer restriction in Section 2 of the JOA.

The enumeration of specific terms that Tribune Publishing points to as the basis for applying the principle of ejusdem generis appears in § 16-10a-627(4):

> A restriction on the transfer or registration of transfer of shares may:
>     (a) obligate the shareholder first to offer to the corporation or other persons, separately, consecutively, or simultaneously, an opportunity to acquire the restricted shares;
>     (b) obligate the corporation or other persons, separately, consecutively, or simultaneously, to acquire the restricted shares;
>     (c) require, as a condition to a transfer or registration, that any one or more persons, including the corporation or any of its shareholders, approve the transfer or registration, if the requirement is not manifestly unreasonable; or

- 22 -

(d) prohibit the transfer or the registration of a transfer of the restricted shares to designated persons or classes of persons, if the prohibition is not manifestly unreasonable.

Utah Code Ann. § 16-10a-627(4).  The statute then states that "[t]he description of the restrictions on the transfer or registration of transfer of shares in Subsection (4) is not exhaustive."  Id. § 16-10a-627(5).  According to Tribune Publishing, "although this list is not exhaustive, an absolute prohibition would not be among the class of unidentified, yet sustainable, stock restrictions."

Tribune Publishing misapplies the principle of ejusdem generis to the Utah statute.  "The doctrine of ejusdem generis applies in instances where an inexhaustive enumeration of particular or specific terms is followed by a general term or terms that suggest a class."  A.T., 34 P.3d at 232; see also Culbertson v. Bd. of County Comm'rs, 44 P.3d 642, 656 (Utah 2001) (stating that the principle of ejusdem generis applies "where an enumeration of particular or specific terms is followed by a general term").  The statute at issue here does not present such a situation.  Here, the general term whose meaning is contested—"any . . . reasonable purpose"—is presented in Subsection (3), before the list of particular examples and in a separate section of the statute.  Utah Code Ann. § 16-10a-627(3).

The relationship of the general term in Subsection (3) to the specific terms in Subsection (4) does not suggest that the general term is limited by the specific

terms. Subsection (3) of the statute sets forth the general rule authorizing stock transfer restrictions with one of three kinds of purposes, including "any reasonable purpose." See Utah Code Ann. § 16-10a-627(3) (listing three purposes for which stock transfer restrictions are authorized). Subsection (4) speaks to a different subject, namely the specific mechanism by which a stock restriction operates to achieve the purposes of Subsection (3). See id. § 16-10a-627(4) (listing four forms of stock transfer restriction that are permitted under the statute). The forms of share transfer restriction listed in Subsection (4) do not speak to the purposes for which a transfer restriction may be employed and, therefore, cannot be read to limit the purposes authorized by Subsection (3). The principle of ejusdem generis is not applicable in this situation.

Tribune Publishing claims that if an absolute restriction on alienation is permitted, then "the carefully crafted list of permissible restrictions would be rendered meaningless." We disagree. By providing specific examples of common types of share transfer restrictions that are certainly permissible, the statute saves courts—and corporations and shareholders—the trouble of conducting the reasonableness inquiry that would otherwise be necessary under § 16-10a-627(3)(c) and that we applied above. In any event, as we noted previously, this restriction in reality operates like the type of restriction that is expressly approved in § 16-10a-627(4)(c), which validates restrictions requiring "that any one or

- 24 -

more persons, including the corporation or any of its shareholders, approve the transfer . . ., if the requirement is not manifestly unreasonable."

## B.  Other Arguments Against the Share Transfer Restriction

The district court certified only the question of whether the share transfer restriction in Section 2 of the JOA is void as against public policy.  Tribune Publishing also raises two other arguments against the validity of the share transfer restriction in its appeal of the denial of its motion for a preliminary injunction.  Both of these arguments are also without merit.

Tribune Publishing argues that the transfer restrictions are void as an illegal restraint on trade.  It alleges that the stock transfer restriction destroys the antitrust immunity that the JOA receives from the Newspaper Preservation Act (NPA), 15 U.S.C. §§ 1801–1804.  The NPA grants this immunity for JOA's provided that the agreements maintain the independent editorial and reporting functions of each party to the JOA.  See 15 U.S.C. § 1802(2) (requiring that there be "no merger, combination, or amalgamation of editorial or reportorial staffs, and that editorial policies be independently determined" in order for a JOA to qualify for the antitrust exemption).   Tribune Publishing argues that Section 2 of the JOA "subverts the 'independent and competitive' voice of The Tribune" such that the JOA does not qualify for the exemption from the antitrust laws. Assuming arguendo the merits of this legal theory, to prevail Tribune Publishing

must show that the transfer restriction prevents The Tribune's editorial and reporting independence. Tribune Publishing entirely fails to do this.

Tribune Publishing claims that Deseret News has wielded its right to enforce the stock transfer restriction so as to prevent The Tribune from coming into (or returning to) the hands of owners who will be critical of the owner of Deseret News, the LDS Church. Specifically, Tribune Publishing alleges that Deseret News "has exercised this anticompetitive power not only to prevent [Tribune Publishing]'s reacquisition of The Tribune, but also to extract from [MediaNews] a promise to avoid taking editorial positions unwelcome to the owners of the Deseret News respecting the dominant institution in Utah—the LDS Church." Appellant's B. (No. 02-4165) at 24–25.

The theory that Section 2 of the JOA has undermined the editorial and reporting independence of The Tribune fails for at least two reasons. First, the JOA expressly requires in other provisions of the contract that editorial and reporting functions remain independent. Section 15 of the JOA states that "[e]ach of the parties hereto shall retain unto itself complete and exclusive control of its news and editorial departments and policies . . . ." 1982 JOA § 15, at 21. That section also states that "there shall be no merger, combination or amalgamation of editorial or reportorial staffs, and editorial policies shall be independently

- 26 -

determined." Id. The same language also appears in the recitals and in Section 9 of the JOA as well.

As the defendants argue, Section 2 cannot therefore be construed to authorize a violation of the editorial independence of the other party to the JOA. We agree with the defendants' argument that "[t]o the extent that [Tribune Publishing] argues, as a matter of fact, that [Deseret News] has secured an agreement by The Tribune's owner to surrender its editorial independence, that is not an argument that Section 2 of the JOA violates the NPA, but that specific conduct violates the JOA itself . . . ." Appellees' B. (No. 02-4165) at 53.

Second, the stock transfer restriction cannot in fact be wielded as the club that Tribune Publishing imagines. If MediaNews wants to transfer ownership of The Tribune to Tribune Publishing, it can do so, and Deseret News would have no ability to stop the transfer. By restructuring a sale of the paper as a sale of KTLLC and not as a sale of the assets of KTLLC, MediaNews could entirely avoid Section 2 of the JOA.[7] Therefore, the stock transfer restriction cannot be used, as Tribune Publishing claims, to keep The Tribune out of the hands of

---

[7]Of course, we do not suggest that the court could restructure the deal as a stock transaction, rather than as an asset transaction. That, it seems to us, would be beyond the authority of the court. We mention this possibility only to show that Desert News does not have unilateral power to prevent Tribune Publishing from acquiring de facto control over KTLLC interest in the JOA if Media News and Tribune Publishing decided to restructure the deal as a stock transaction.

- 27 -

owners perceived to be hostile to Deseret News's interests. For these reasons, we conclude that Tribune Publishing's theory that Section 2 of the JOA gives Deseret News the power to influence the editorial independence of The Tribune is without merit.

Tribune Publishing next argues that Deseret News has waived its right to enforce the transfer restriction, but this argument also is unpersuasive. It correctly states that a party waives a right "by conduct inconsistent with an intent to enforce that right" and "may not thereafter seek judicial enforcement." Lone Mt. Prod. Co. v. Natural Gas Pipeline Co., 710 F. Supp. 305, 311 (D. Utah 1989). But Deseret News has taken no action that would suggest it lacks the intent to enforce the transfer restriction to the extent possible. The operative transfer restriction is Section 2 of the 1982 JOA, which updated the original 1952 JOA. It appears undisputed that there has not been a single transfer of JOA stock since the 1982 JOA took effect. There were stock transfers in the past between the shareholding companies and their directors, but this was because Utah law at the time required a director of a corporation to own stock in it. Utah Code Ann. § 18-2-20 (1943). Thus, the Tribune Publishing and Deseret News representatives to the NAC board had to own at least one share of stock in NAC. The stock transfers occurred when a director retired and his share was transferred to his replacement. That the parties consented to share transfers under these

circumstances does not constitute waiver of the right to enforce the transfer restriction at all. "To determine whether there was an intent to relinquish a right, the court looks at the totality of the circumstances, and whether the circumstances warrant an inference of relinquishment." Pasker, Gould, Ames & Weaver, Inc. v. Morse, 887 P.2d 872, 876 (Utah Ct. App. 1994). An inference of waiver is not supported by the record in this case. And we reject Tribune Publishing's contention that there has been an attempt to "lull [Tribune Publishing] into a false assurance that strict compliance with a contractual duty will not be required." Indeed, as discussed in Part I.A., supra, the record indicates that Tribune Publishing considered the transfer restriction to be enforceable against it.

Finding unpersuasive Tribune Publishing's arguments that Section 2 of the JOA is invalid, we conclude that the stock transfer restriction is valid and enforceable.

## II. SUBJECT MATTER JURISDICTION

Tribune Publishing argues that the district court did not have subject matter jurisdiction over this case. When the lawsuit was originally filed in December 2000, the only named defendants were AT&T Corporation and AT&T Internet & Broadband Services, LLC. The original parties to the case were completely diverse and the district court had subject matter jurisdiction over the case under the diversity statute, 28 U.S.C. § 1332. Shortly after filing the original complaint,

Tribune Publishing amended that complaint to name MediaNews as a defendant. This did not affect diversity jurisdiction because MediaNews is a Delaware corporation headquartered in Colorado and Tribune Publishing is a Utah corporation. Tribune Publishing contends, however, that the district court's jurisdiction over the case was destroyed later when Deseret News was joined to the action as a defendant because, like Tribune Publishing, Deseret News is a citizen of Utah. The determination of the district court's subject matter jurisdiction is a question of law that we review de novo, Hart v. Dep't of Labor ex rel. United States, 116 F.3d 1338, 1339 (10th Cir. 1997), and we conclude that the joinder of Deseret News as a defendant in the case did not destroy the district court's diversity jurisdiction.

In July 2001, the parties filed motions relating to the joinder of Deseret News. First, Deseret News itself moved to intervene in the action as of right pursuant to Fed. R. Civ. P. 24(a). Deseret News brought its motion for the narrow purpose of having the case dismissed for lack of subject matter jurisdiction because Deseret News and Tribune Publishing are citizens of the same state. Second, MediaNews adopted the arguments of Deseret News and moved to dismiss the case because the case could not proceed justly without the participation of Deseret News, and to join Deseret News would destroy the district court's diversity jurisdiction. Third, Tribune Publishing moved to join

- 30 -

Deseret News as a party under Fed. R. Civ. P. 25(c). Rule 25(c) provides that when an interest is transferred from one who is a party to the litigation to one who is not, the district court may, upon motion, direct "the person to whom the interest is transferred to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c). Tribune Publishing alleged that MediaNews transferred an interest to Deseret News when, immediately after MediaNews acquired KTLLC from AT&T in January 2001, MediaNews and Deseret News negotiated and enacted amendments to the JOA which removed Tribune Publishing from its role in managing the NAC and gave Deseret News the right to appoint certain representatives to the NAC, a right previously held by Tribune Publishing.

The district court denied Deseret News's and MediaNews's motions. It concluded that Deseret News failed to meet one of the requirements of Fed. R. Civ. P. 24(a) by not having made its motion in a timely fashion. It found that MediaNews's motion to dismiss should be denied because Deseret News was not an indispensable party to the action. However, the district court granted Tribune Publishing's motion to join Deseret News pursuant to Rule 25(c). The court concluded that a transfer of interest occurred when MediaNews group agreed to give Deseret News rights under the JOA—rights properly considered to be assets of The Tribune—that Deseret News did not have before the litigation began.

- 31 -

Although the district court initially joined Deseret News as a party only insofar as it acquired interests under the renegotiated JOA, that limitation was later lifted and Deseret News was permitted to participate fully in the case.

The issue before us, therefore, is whether the joinder of Deseret News destroyed the district court's subject matter jurisdiction over the case. It has long been the rule that to satisfy the diversity of citizenship requirement of 28 U.S.C. §1332(a)(1) the plaintiffs and defendants must be completely diverse: No plaintiff can be a citizen of the same state as any defendant. Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 373–74 (1978). Moreover, "[d]iversity jurisdiction, once established, is not defeated by the addition of a non-diverse party to the action." Freeport-McMoran, Inc. v. K N Energy, Inc., 498 U.S. 426, 428 (1991) (per curiam). However, diversity jurisdiction will be destroyed if it is determined that the later-joined, non-diverse party was indispensable to the action at the time it commenced. Harris v. Ill.-Cal. Express, Inc., 687 F.2d 1361, 1367 (10th Cir. 1982) ("Once jurisdiction is grounded in diversity, it is not lost by the intervention . . . of a party whose presence in the action is not indispensable . . . ."); Am. Nat'l Bank & Trust Co. v. Bailey, 750 F.2d 577, 582 (7th Cir. 1984) ("[T]he rule that there must be complete diversity to sustain diversity jurisdiction is not absolute. . . . [I]f the nondiverse party comes into the case by intervening in it, his presence will not deprive the court of jurisdiction unless the intervenor was

an indispensable party when the complaint was filed."); cf. Burka v. Aetna Life Ins. Co., 87 F.3d 478, 482–83 (D.C. Cir. 1996) ("[A] Rule 25(c) addition of a non-diverse party may destroy diversity jurisdiction . . . if the added party was indispensable at the time the action began."). There is no question that Deseret News was a nondiverse party when it joined the case. Thus, the crux of this jurisdictional issue is whether Deseret News was indispensable at the time the original complaint was filed.

Tribune Publishing's argument that Deseret News was a necessary and indispensable party from the outset is based upon the existence of the stock transfer restriction in the JOA. Tribune Publishing argues that from the beginning the primary relief it has sought in this case is an order compelling KTLLC to specifically perform under the Option Agreement. But, Tribune Publishing argues, because the Option Agreement gives Tribune Publishing the right to purchase from KTLLC "all, and not less than all" of the Tribune Assets, and KTLLC's stock in the NAC is one of the Tribune Assets, Deseret News's right to enforce the stock transfer restriction is implicated by the remedy Tribune Publishing seeks. Indeed, the defendants have taken the position that the stock transfer restriction not only prevents KTLLC from transferring the NAC stock to Tribune Publishing without the consent of Deseret News, but also they argue that the fact that the transfer restriction existed prior to the execution of the Option

Agreement means that the parties to the Option Agreement intended to require Deseret News's consent to KTLLC's performance under the Option Agreement.

Whether a party is indispensable is determined by considering the factors set forth in Fed. R. Civ. P. 19.  See Angst v. Royal Maccabees Life Ins. Co., 77 F.3d 701, 704–05 (3d Cir. 1996); Nat'l Union Fire Ins. Co. v. Rite Aid, 210 F.3d 246, 249–50 (4th Cir. 2000).  The analysis has two parts: "first, we must determine whether a party is necessary under 19(a); second, we must determine whether it is indispensable under 19(b)."[8]  Angst, 77 F.3d at 705; Rite Aid, 210 F.3d at 249.  In making these determinations, we evaluate "the facts as they exist[ed] when the case [was] filed, and not by what happens later."  Bailey, 750 F.2d at 582; Freeport McMoRan, 498 U.S. at 428.

Under Rule 19(a), a party is necessary if:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to substantial risk of incurring

---

[8]Rule 19 provides a mechanism for joining, where feasible, parties necessary for the just adjudication of a dispute and, where it is not feasible to join such parties, for dismissing the case.  When applying Rule 19 itself and not, as here, merely relying on the Rule 19 factors to make a jurisdictional determination, there is a third factor to consider: whether joinder of a necessary party is "feasible."  See Citizen Potawatomi Nation v. Norton, 248 F.3d 993, 997 (10th Cir. 2001).  The feasibility of joinder is not relevant here because the party in question has already been joined pursuant to Rule 25(c).

> double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a). We conclude that Deseret News is not necessary under either Rule 19(a)(1) or 19(a)(2).

Under Rule 19(a)(1), Deseret News's absence from the case would not prevent the district court from according complete relief among those already parties to the case. Tribune Publishing mistakenly assumes that the only remedy that will give it complete relief is an order compelling KTLLC to specifically perform under the Option Agreement with respect to every Tribune Asset it owns. An order of complete specific performance is one way in which Tribune Publishing can receive complete relief, but it is not the only way.

Tribune Publishing can be awarded complete relief under the Option Agreement through a variety of remedies short of an order requiring complete specific performance by KTLLC. For example, the district court could enter a decree of specific performance against KTLLC with respect to every Tribune Asset it owns except for the NAC stock. The court then could award an appropriate amount of damages to compensate Tribune Publishing for KTLLC's failure to transfer that last Tribune Asset. Or, the district court could avoid equitable relief altogether and simply award damages to Tribune Publishing to compensate it for KTLLC's failure to perform under the contract. There may also be other equitable restrictions that could be placed on KTLLC's voting of its

NAC interests that could be part of a package of remedies to provide Tribune Publishing with complete relief. (We consider these and other potential remedies in greater detail in Part III, infra.) The district court thus can fashion complete relief for Tribune Publishing in manner that leaves the ownership of the NAC stock in KTLLC's hands and therefore does not trigger Deseret News's right to enforce the stock transfer restriction in the JOA. Because complete relief can be granted without having Deseret News as a party to the case, Deseret News is not necessary within the terms of Rule 19(a)(1).

Under Rule 19(a)(2), it is true that Deseret News is a party "claim[ing] an interest relating to the subject of the action" in that it seeks to enforce its right to prevent the transfer of one of the Tribune Assets—the NAC stock—that is subject to the Option Agreement. However, for some of the same reasons that the Rule 19(a)(1) factor is not present, Desert News is not "so situated that the disposition of the action in [Deseret News'] absence" will cause either of the problems identified by Rule 19(a)(2)(i) and (ii). Rule 19(a)(2)(i)'s concern that an absent party's ability to protect its interests would be impaired if the case proceeds without the party is not implicated if the district court fashions remedies that do not require KTLLC to relinquish title to the NAC stock. Such remedies also avoid the risk, addressed by Rule 19(a)(2)(ii), of a party's being burdened with multiple, inconsistent obligations. Theoretically, KTLLC could be subject to

- 36 -

conflicting judgments if the district court ordered or refused to order KTLLC to transfer the NAC stock to Tribune Publishing pursuant to the Option Agreement and a state court entered an order in a case where Deseret News is a party requiring the opposite action. But this possibility is also eliminated if the district court fashions relief so as to avoid a transfer of the NAC stock.

Because we conclude that Deseret News is not a necessary party, it cannot be an indispensable one and we therefore need not consider Rule 19(b).

Our conclusion that Deseret News is not an indispensable party is bolstered, but not determined, by the fact that no party in the case considered Deseret News to be indispensable at the time the action commenced. Cf. Burka, 87 F.3d at 483 (supporting conclusion that party joined under Fed. R. Civ. P. 25(c) was not indispensable by reference to "appellants' failure to seek joinder [of the party] as a defendant at an earlier stage of this case"). In ruling on the motions to join Deseret News, the district court observed that "[n]one of the parties contend that Deseret News Publishing was an indispensable party at the time the original Complaint was filed." Order of Aug. 29, 2001, at 18. Moreover, Tribune Publishing argued below that Deseret News was not an indispensable party at the time the lawsuit was filed, and the president of Deseret News itself filed an

- 37 -

affidavit with the court stating that Deseret News did not consider itself to be indispensable to the case.[9]

For the foregoing reasons, we hold that the district court does have subject matter jurisdiction over this case.

### III. DENIAL OF MOTION FOR PRELIMINARY INJUNCTION

With the July 31, 2002, termination date of the Management Agreement looming, Tribune Publishing filed a motion for a preliminary injunction that would allow it to continue to manage The Tribune until it assumed control over the newspaper pursuant to the Option Agreement or its rights to the Tribune

---

[9]Mr. Wall later filed another affidavit changing his position on the question of Deseret News' indispensability, but his claim was based upon the content of the second amended complaint, which was filed several months after Mr. Wall's first affidavit. The district court described the second affidavit as follows:

> The Second Wall Affidavit states there have been "a number of developments that have convinced [him]," contrary to his previous affidavit, that now Deseret News Publishing's interest "would be significantly impaired if this case were to proceed in [its] absence." Mr. Wall now says that when he made the previous Affidavit he understood that if Deseret News Publishing were dropped from as a party that "Plaintiff would drop its claim to adjudicate DNPC's right to consent or withhold consent to SLTP's exercise of its option" but that the latest complaint has not done so. He contends that [the second amended complaint] "is a continuing attempt by SLTPC to seek to adjudicate and prejudice DNPC's rights under the Joint Operating Agreement in DNPC's absence. . . ." Second Wall Affidavit at ¶ 3.

Order of Aug. 29, 2001, at 10–11. Mr. Wall's reaction to the second amended complaint is irrelevant to the question before us: whether Deseret News was indispensable at the time the case was originally filed. See Freeport McMoRan, 498 U.S. at 428; Bailey, 750 F.2d at 582; cf. Burka, 87 F.3d at 482.

Assets were otherwise determined. The district court denied the motion, concluding that Tribune Publishing did not make the required showings under the four-part standard for granting preliminary injunctions, and Tribune Publishing appeals that ruling. We review a district court's denial of a preliminary injunction for an abuse of discretion, <u>Davis v. Mineta</u>, 302 F.3d 1104, 1110-11 (10th Cir. 2002), and although we conclude that the district court made one error in its analysis, that error is not sufficient to change our conclusion that the district court was correct to deny Tribune Publishing's motion for a preliminary injunction.

To receive a preliminary injunction, the plaintiff must establish the following four factors:

> (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest.

<u>Kikumura v. Hurley</u>, 242 F.3d 950, 955 (10th Cir. 2001). In addition, "the right to relief must be clear and unequivocal" because "a preliminary injunction is an extraordinary remedy." <u>Id.</u> (internal quotation marks and citations omitted). This standard, which is difficult to meet under ordinary circumstances, is heightened when the requested preliminary injunction will change the status quo. In such cases, the "movant has an 'even heavier burden of showing that the four factors

listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued.'" Id. (quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098–99 (10th Cir. 1991) (internal quotation marks omitted).

We agree with the district court that the heightened standard should apply in this case because the preliminary injunction that Tribune Publishing sought would have changed the status quo. At the time it sought the preliminary injunction, Tribune Publishing's rights and authority as manager of The Tribune were contractual. It served as the KTLLC's agent pursuant to the Management Agreement. That contract was not renewed, and Tribune Publishing does not challenge KTLLC's notice of non-renewal dated January 30, 2002, nor that the Management Agreement terminated, according to its express terms, on July 31, 2002. Therefore, what Tribune Publishing sought with a preliminary injunction was the realization of its expectation that, on August 1, 2002, it would continue to manage the newspaper. The reality, however, was that on August 1 the manager of the newspaper was to be KTLLC. The status quo was that Tribune Publishing had a contractual right to manage The Tribune until July 31, 2002, and after that date KTLLC has the right to manage the newspaper. It would have altered the status quo for the court, through a preliminary injunction, to require KTLLC to forgo legal rights it had at the time the injunction would have taken effect.

- 40 -

## A.      Likelihood of Success on the Merits

The first showing Tribune Publishing had to make under the preliminary injunction standard was that the evidence heavily and compelling showed that it would prevail on the merits.   This, in turn, required Tribune Publishing to establish two separate propositions.  Tribune Publishing had to show that it was entitled to continue to manage The Tribune after the expiration of the Management Agreement.  Tribune Publishing also had to show as a threshold issue that it was likely to prevail in its attempt to acquire ownership of the Tribune Assets because its legal theories in support of its claim to continued management depended upon the fact that it had a valid option to purchase the newspaper assets.  The failure to establish either of these propositions would have been sufficient to deny Tribune Publishing's motion, and the district court found that neither proposition had merit.  The district court made rulings on each of these issues, and because either ruling could have been the basis for the district court's order, we review each of them.

We conclude that, contrary to the district court's conclusion, Tribune Publishing can make the required showing with respect to its claim of the right to acquire the Tribune Assets.  However, we agree with the district court that Tribune Publishing cannot make the required showing with respect to its claim to continued management of The Tribune in the interim after August 1, 2002.  This

- 41 -

second conclusion is sufficient to hold that Tribune Publishing cannot establish the success-on-the-merits factor of the preliminary injunction standard.

### 1. Claim of Right to Acquire the Tribune Assets

With regard to ownership of the Tribune Assets, we disagree with and reverse the district court's ruling that Tribune Publishing is not likely to succeed in its attempt to acquire The Salt Lake Tribune and its assets. Even under the heightened standard requiring a heavy and compelling showing, we conclude that there is a substantial likelihood that after a trial Tribune Publishing will succeed in establishing its claim of the right to acquire the assets of The Tribune.

The district court concluded on summary judgment and reiterated in its ruling on the motion for preliminary injunction that the Option Agreement was valid and enforceable. That conclusion on summary judgment is not before us on appeal and, in any event, we agree with it. The Option Agreement gives Tribune Publishing the right "to purchase all, and not less than all, of the . . . assets used, held for use or usable in connection with the operation and publication of The Salt Lake Tribune." Option Agreement § 1. Despite the validity of this contract right, the district court held that Tribune Publishing had not shown that it was likely to prevail in its efforts to acquire the newspaper assets "because it has not provided the court with a clear roadmap as to how [Tribune Publishing] intends to overcome the current hurdles to ownership." Order Denying Pl.'s Mot. for

- 42 -

Prelim. Inj., July 22, 2002, at 10. The "current hurdles to ownership" were explained in the May 31, 2002, Order on Motions for Summary Judgment as being the fact that the stock transfer restriction in Section 2 of the JOA was valid and enforceable and that the transfer restriction was an obstacle to Tribune Publishing's obtaining a specific performance remedy for any violation of the Option Agreement. Although we agree with the district court that the share transfer restriction in the JOA is valid and enforceable, see Part I, supra, we disagree with the conclusion that, as a result, Tribune Publishing will not be able to show a substantial likelihood of success on the merits of its claim to eventual ownership of all of the Tribune Assets.

To demonstrate a substantial likelihood of success on the merits of its claim of the right to acquire the Tribune Assets, Tribune Publishing was required "to present 'a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought.'" Autoskill v. Nat'l Educ. Support Sys., 994 F.2d 1476, 1487 (10th Cir. 1993) (quoting Cont'l Oil Co. v. Frontier Ref. Co., 338 F.2d 780, 781 (10th Cir. 1964)). The district court concluded that Tribune Publishing had a clear entitlement under the Option Agreement to receive "all, and not less than all" of the Tribune Assets upon exercise of the option. It felt, however, that it could not fashion the relief requested by Tribune Publishing:

- 43 -

a decree of specific performance requiring the transfer of all of the Tribune Assets.

We find that the district court read too narrowly the relief sought by Tribune Publishing in its complaint. Tribune Publishing does indeed ask for a decree of specific performance that would require KTLLC, upon satisfaction of the terms of the Option Agreement, to transfer to Tribune Publishing all of the Tribune Assets, including the NAC stock. Fourth Amended Compl. and Jury Demand, ¶¶ 154, at 37. But Tribune Publishing also seeks in its complaint "equitable relief, including, but not necessarily limited to, restitution, accounting, resulting or constructive trust and disgorgement, to the extent [the other] equitable remedies [sought by Tribune Publishing] do not fully provide [Tribune Publishing] with the full benefit of its bargain," id., ¶ 14, at 48, and "such other relief as the Court deems just and proper," id., ¶ 16, at 49. We read Tribune Publishing's complaint as seeking whatever combination of equitable and legal relief the court may award to remedy a refusal by KTLLC to perform under the Option Agreement, including a failure to transfer to Tribune Publishing the NAC stock. It is a venerable principle of our law that for the violation of every right there should be a remedy, and we should not lightly put down our obligation to determine whether appropriate remedies exist. See, e.g., Comm'r of Patents v. Whiteley, 71 U.S. (4 Wall.) 522, 526 (1866) (citing the principle "that there

should be a remedy to enforce every right"); <u>Satterlee v. Matthewson</u>, 27 U.S. (2 Pet.) 380, 389 (1829) ("For every right it is a maxim that there is a legal remedy for its violation."); <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137, 163 (1803) (citing the principle that "every right, when withheld, must have a remedy, and every injury its proper redress").

As we have noted before, Tribune Publishing asserted its right to pay the option price and, in exchange, to acquire all of the Tribune Assets. Virtually every asset of <u>The Tribune</u> necessary for producing the newspaper could be transferred to Tribune Publishing without violating Section 2 of the JOA. Indeed, even the legal title to the assets that are managed by the NAC, such as the printing presses, could pass to Tribune Publishing without violating Section 2 of the JOA.[10] The fact that the JOA would prevent a transfer of only the NAC stock should not shield KTLLC from performing under the Option Agreement in every other respect.

There are three kinds of remedies that might be available under the circumstances of this case: (1) specific performance as to all the Tribune Assets that can be transferred without triggering the share transfer restriction of the JOA; (2) damages to compensate Tribune Publishing for the NAC stock that cannot be

_____

[10]The printing facilities managed for KTLLC and Deseret News by the NAC are owned by KTLLC and Desert News as tenants in common. <u>See</u> 1982 JOA § 6, at 12.

transferred; and (3) equitable relief other than specific performance if a damages award would be insufficient to remedy the failure or inability of KTLLC to transfer the NAC stock.  As we broadly construe the relief that Tribune Publishing seeks, there are enough potential remedial options, or combinations of options, so that Tribune Publishing can establish a substantial likelihood of success on the merits.  We mentioned earlier in Part II, supra, a number of potential remedies are available that can give full relief to Tribune Publishing[11] without implicating Deseret News's right to enforce the stock transfer restriction in the JOA.  We list here several of these possible remedies to illustrate the flexibility the district court has in awarding relief without intending that this listing be either dispositive or exhaustive.[12]

First, the district court could award Tribune Publishing a decree of specific performance ordering KTLLC to transfer all of the Tribune Assets except the NAC stock.  Tribune Publishing would then be entitled to damages to compensate it for its damages resulting from the failure to transfer the NAC stock.  See

---

[11]If not the actual transfer of all the Tribune Assets, at least the functional equivalent in the eyes of the law of a transfer of all the Tribune Assets.

[12]At this point, none of these potential remedies has been tested in the crucible of an adversarial hearing with evidence or full legal argument. Accordingly, we do not endorse or pre-approve any of them.  We list them here only to show that at this preliminary stage of the proceeding, it is error to conclude that Tribune Publishing has not shown a substantial likelihood of success on the merits solely because of the perceived difficulty in fashioning relief.

3 E. Allan Farnsworth, Farnsworth on Contracts §12.5, at 169 (2d ed. 1998) ("Along with any equitable relief by specific performance or injunction, a court may also award damages and grant other relief."); 3 Dan B. Dobbs, Law of Remedies § 12.8(1), at 193 (2d ed. 1993) ("Specific performance may be combined with damages in appropriate cases; the fact that specific performance is or must be denied as to some part of the contract does not prevent specific performance as to the remainder.").

Second, if the injury Tribune Publishing would suffer as a result of the failure or inability of KTLLC to transfer the NAC stock could not adequately be remedied by damages, then the district court could consider equitable remedies besides specific performance to address the NAC stock. See, e.g., Thurston v. Box Elder County, 892 P.2d 1034, 1041 (Utah 1995) ("A trial court is accorded considerable latitude and discretion in applying and formulating an equitable remedy [in contract actions]."); 27A Am. Jur. 2d Equity § 64 (2002) (same). For example, Tribune Publishing might be awarded a decree of specific performance as to all of the assets except the NAC stock, and the decree might then require KTLLC to manage its interests in the NAC in such a manner as not unreasonably to injure Tribune Publishing in its operation of the Tribune Assets that are transferred to it.

Third, there is also the possibility that the district court might fashion a remedy under the successors-and-assigns clause in the JOA. The clause indicates that the parties contemplated that their rights and obligations under the JOA were assignable. 1982 JOA § 22, at 31 ("This agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto."). There is precedent for assignment of JOA rights in the past conduct of the parties. Under the Management Agreement, KTLLC assigned to Tribune Publishing "the authority to act on behalf of [KTLLC] with respect to all action required or permitted to be taken by [KTLLC] under the Joint Operating Agreement." Management Agreement § 3.02(ii), at 3. For five years, Tribune Publishing participated in running the NAC without owning legal title to the NAC stock.

Fourth, the district court could consider ordering KTLLC to transfer all of the Tribune Assets to Tribune Publishing except the NAC stock while providing in some way for the possibility that Tribune Publishing could file a new lawsuit in state court to clarify what, if any, rights it might have vis-a-vis the NAC or KTLLC pursuant to the JOA once it acquired all of the Tribune Assets except for the NAC stock. For example, if Tribune Publishing were to acquire all of the Tribune Assets except the NAC stock, Tribune Publishing might argue in a state

action where personal jurisdiction over defendants might not be an issue that the NAC owes it a fiduciary duty under Utah law.[13]

Each of these remedies discussed above have the potential of delivering complete relief to Tribune Publishing in the eyes of the law and might be sufficient to be the predicate for its claim of the right to manage The Tribune during the interim. Again, we do not propose to determine here what the appropriate remedy should be if it is determined after trial that KTLLC has breached the Option Agreement. Our purpose is merely to illustrate the range of potential options available to the district court to remedy fully a breach of that contract.

In sum, we conclude that there is a substantial likelihood that Tribune Publishing will prevail at trial on its claim to enforce its rights under the Option Agreement and, in that event, that the district court can select from a variety of

---

[13]In Part I, supra, we concluded that the purpose of the stock transfer restriction in Section 2 of the JOA was to prevent anyone besides KTLLC or Deseret News from participating in the management of the NAC. Yet the potential remedies discussed immediately above each would have the effect of giving Tribune Publishing some control over the NAC or the manner in which KTLLC exercised its control over the NAC. These remedies might be available in this case notwithstanding Section 2 of the JOA because, in the final analysis, the share transfer restriction in Section 2 of the JOA is not completely effective in excluding participation by others whom Deseret News does not approve. Thus, that provision must be interpreted consistent with its inherent inability to prevent a new entity from acquiring ownership of KTLLC and thereby control over one-half of the NAC stock.

legal and equitable remedies to shape relief that fully redresses Tribune Publishing's claim without infringing Deseret News' rights under Section 2 of the JOA.

### 2.  Claim to Continued Management of <u>The Tribune</u>

The second proposition Tribune Publishing had to establish was that it was entitled to continue to manage <u>The Tribune</u> after the termination of the Management Agreement and before it acquired the Tribune Assets pursuant to the Option Agreement.  We agree with the district court that Tribune Publishing failed to show that it has a right to continue to manage <u>The Tribune</u> during the interim period.  This conclusion is sufficient for us to hold that Tribune Publishing has not established, for the purposes of its motion for a preliminary injunction to allow it management rights during the interim, that it is likely to succeed on the merits on that issue.

Tribune Publishing advanced two theories in support of its argument that it has a right to continue to manage <u>The Tribune</u>: that as equitable owner of the newspaper assets it had the right to manage them in advance of the closing of the option transaction, and that the implied covenant of good faith and fair dealing in the Option Agreement entitled Tribune Publishing to continue its management role.  Neither theory has merit as applied to the facts of this case.

The Option Agreement is a contract under Delaware law, and the obligation of good faith and fair dealing is part of all Delaware contracts. Chamison v. Healthtrust, Inc., 735 A.2d 912, 920 (Del. Ch. 1999). But its application is limited to circumstances that do not include the facts of this case. Tribune Publishing bargained for the Management Agreement, and that Agreement expressly states that it would last for a five-year period unless it were renewed, and it was not renewed. Where the subject in dispute "is expressly covered by the contract . . . the implied duty to perform in good faith does not come into play." Dave Greytak Enters. v. Mazda Motors of Am., 622 A.2d 14, 23 (Del. Ch. 1992). The Management Agreement is clear that Tribune Publishing's management term, if terminated by KTLLC, would not extend beyond by the five-year period. Article II, Section 2.01 of the Management Agreement states:

> The term of this Agreement shall commence on the date hereof and shall continue for an initial period of five (5) years thereafter unless terminated sooner . . . . Thereafter, unless terminated sooner . . . this Agreement shall be automatically renewed for successive one-year periods unless either party provides the other with 180 days written notice prior to the end of the initial period, or 120 days written notice prior to the end of any such renewal period, that it will not renew this Agreement.

Pursuant to the terms of this provision, in January 2002 KTLLC notified Tribune Publishing that it would not renew the contract. Tribune Publishing cannot rely upon the doctrine of good faith and fair dealing to acquire a right denied to it by the express terms of a contract for which it freely bargained.

The purpose of the implied covenant of good faith and fair dealing is to ensure that a party is not deprived of the fruits of a contract by the arbitrary or unreasonable actions of the other party. Wilgus v. Salt Pond Inv. Co., 498 A.2d 151, 159 (Del. Ch. 1985). The fruit of the Management Agreement was a five-year management term. Tribune Publishing has received that benefit of the contract. "The implied covenant [of good faith and fair dealing] cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract." Chamison, 735 A.2d at 921.

We also find no merit in Tribune Publishing's argument that the doctrine of equitable conversion entitles it to continue to manage the newspaper. Tribune Publishing is correct to say that "[e]quitable conversion is an equitable remedy used to effectuate the intentions of the parties and to prevent injustice." Appellant's B. (No. 02-4126) at 40. The doctrine, which originated in the context of sales of real property, imposes an obligation on the legal owner of an asset to preserve it until the beneficial owner acquires legal title. Eddington v. Turner, 38 A.2d 738, 739–40 (Del. 1944); cf. 3 Dobbs, Law of Remedies, supra, § 12.8(1), at 196 ("[T]he landowner who contracts to sell Blackacre is owner of the legal title until the deed is delivered, but in the eyes of equity he holds that title as trustee for the buyer . . . .") The doctrine does not, however, require the legal owner to forfeit possession and control of the asset to the beneficial owner. The obligation

is merely to preserve the asset. Cf. Annotation, 97 A.L.R. 3d 1220 (1980) (stating the general rule that "a vendor has no right to commit what would ordinarily constitute waste between the time of his having made a contract to sell his land and the actual conveyance thereof").

Tribune Publishing provides no case law or other authority for the proposition that equitable conversion permits the beneficial owner of an asset to acquire actual possession and control of it before acquiring legal title. Even if KTLLC were taking actions that could be considered destructive to the Tribune Assets, the remedy would not be for a court to order KTLLC to turn over control of the asset to Tribune Publishing. The remedy would be an injunction preventing the destructive acts or, perhaps, the appointment of a receiver to manage the assets until the closing of the option transaction. In fact, the district court in this case took the precaution of entering an order preventing MediaNews and KTLLC from taking material acts that might be considered irrevocable after the expiration of Tribune Publishing's Management Agreement.

The doctrine of equitable conversion "is not a favored one and is used only where actual necessity requires its application to effectuate the intentions of the parties and, thus, prevent an injustice." Cardinal Indus. v. Buckeye Fed. Sav.& Loan, 105 B.R. 834, 852 (Bankr. S.D. Ohio 1989). Tribune Publishing has not shown that injustice will result from MediaNews's management of the newspaper

from the end of Tribune Publishing's Management Agreement to when Tribune Publishing acquires legal title to the assets. There is no actual necessity requiring Tribune Publishing to be re-installed as manager of The Tribune when it negotiated and signed a contract that expressly includes a provision providing for its management control to end at a certain date.

## B. The Other Preliminary Injunction Factors

To be entitled to a preliminary injunction, Tribune Publishing also had to show that it would suffer irreparable injury if the injunction is not issued, that the threatened injury outweighs the harm the preliminary injunction would cause the defendants, and that, if issued, the injunction would not adversely affect the public interest.

### 1. Irreparable Harm

Tribune Publishing argues that it will suffer several irreparable harms if the preliminary injunction is not granted and it is not allowed to continue to manage The Tribune. Most importantly, it says, is the fact that the editorial voice of the newspaper will change under MediaNews's control. Tribune Publishing also says that the newspaper will lose subscribers and advertisers as long as MediaNews controls The Tribune, and that changes in personnel, the construction of an expensive new press facility, a change to the newspaper's newsprint supplier, elimination of the on-porch delivery preferred by subscribers, and merger of the

newspaper's on-line services and accounts payable department with MediaNews's in Denver all constitute irreparable harm. We disagree.

Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise. See Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir.1986) ("Injury is generally not irreparable if compensatory relief would be adequate.") Several of the harms that Tribune Publishing alleges could be compensated for and therefore are not irreparable. For example, actionable business losses resulting from cancelled subscriptions or lower advertising volume can be remedied by money damages. Similarly, we imagine that the additional costs associated with a different newsprint supplier, or the cost of re-establishing The Tribune's online services and accounts payable department in Utah, are not great and also could be remedied by money damages.

Other harms that Tribune Publishing alleges can be easily undone when Tribune Publishing acquires the newspaper. Its editorial voice will be restored the moment it again is writing the newspaper's editorials, and on-porch delivery can simply be re-instituted. Because these "harms" can be reversed so easily, we find that they cannot be considered irreparable.

Tribune Publishing's fears about the construction of an expensive new printing facility are also unfounded. The district court entered an order

specifically preventing MediaNews or KTLLC from "proceed[ing] with irrevocable acts to acquire land and build a new press facility."  Order Denying Pl.'s Motion for Prelim. Inj., July 22, 2002, at 16.  Because the court has enjoined MediaNews and KTLLC from constructing the facility, it cannot constitute a harm to Tribune Publishing.

Finally, we note that these alleged harms stem from Tribune Publishing's loss of control over management of the newspaper.  In particular, the removal of Tribune Publishing personnel from positions of authority and control is to be expected once Tribune Publishing is no longer in charge of The Tribune's operations.  This change in control results from the express terms of a contract it negotiated, and therefore the removal of Tribune Publishing's managers is a harm that Tribune Publishing inflicted upon itself.  We will not consider a self-inflicted harm to be irreparable, and we therefore reject Tribune Publishing's contention that personnel changes among the management staff constitute an irreparable harm. See Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 839 (3d Cir. 1995); Lee v. Christian Coalition of America, Inc., 160 F. Supp. 2d 14, 33 (D.D.C. 2001); 11A Charles Alan Wright et al., Federal Practice & Procedure §2948.1, at 152–53 (2d ed. 1995).

## 2.    Balance of Harms

Because we have concluded that Tribune Publishing will not be irreparably harmed by the denial of its motion for a preliminary injunction, we find that there is no harm to balance against the potential harm to the defendants if the injunction is granted. Cf. Davis v. Mineta, 302 F.3d at 1116 (balancing "the irreparable harms we have identified against the harm to defendants if the preliminary injunction is granted"). Even if we were convinced that the absence of an injunction would create some kind of harm to Tribune Publishing, it would be less than irreparable harm and it would not outweigh the harm to the defendants of the issuance of an injunction.

The right of MediaNews and KTLLC to manage the newspaper they own was restricted by the Management Agreement, which delegated management authority to Tribune Publishing as their agent. Now that the Management Agreement has expired, the right to manage the newspaper reverts back to MediaNews and KTLLC. To take away this right would harm MediaNews and KTLLC by reducing their legitimate control over a business that MediaNews purchased for $200 million. Loss of control over the newspaper is a risk to MediaNews's investment, a risk that might be amplified if Tribune Publishing would not be guided and limited in its management as it was under the Management Agreement. Because the harms identified by Tribune Publishing can

be remedied or are self-inflicted, we find that they are outweighed by the harm the defendants would face if the injunction were granted.

### 3. The Public Interest

The final preliminary injunction factor is whether the injunction, if issued, would adversely affect the public interest. That factor is not a consideration in this case. We agree with the district court that the parties have not shown that the public interest would be implicated either positively or negatively by an injunction. Order Denying Pl.'s Mot. for Prelim. Inj., July 22, 2002, at 15.

\* \* \* \*

In reviewing the four preliminary injunction factors, we have identified only one error by the district court: its conclusion that Tribune Publishing is not likely to prevail on the merits of its claim to ownership of the Tribune Assets. However, because we agree with the district court that Tribune Publishing has not established a likelihood of prevailing on the issue of its claim to manage the Tribune Assets in the interim before it acquires those assets, and because we agree with the district court's conclusion that Tribune Publishing does not prevail on the other preliminary injunction factors, we hold that the district court did not abuse its discretion in denying the motion for a preliminary injunction.

**CONCLUSION**

For the foregoing reasons we make the following rulings: First, with respect to the certified question, we conclude that the stock transfer restriction in Section 2 of the JOA is not contrary to Utah public policy and is, in fact, authorized under Utah Code Ann § 16-10a-627. Second, we hold that the district court has subject matter jurisdiction over this case; jurisdiction was not destroyed when Deseret News was joined to the action because Deseret News was not a necessary party. Third, we conclude that the district court did not abuse its discretion in denying Tribune Publishing's motion for a preliminary injunction to manage the Tribune Assets prior to the resolution of its suit to enforce its rights under the Option Agreement. Fourth, despite our agreement that the preliminary injunction was properly denied, we hold that the district court erred when it concluded that Tribune Publishing was not substantially likely to prevail at trial on the merits of its claim to acquire the Tribune Assets under the Option Agreement.

Accordingly, the district court's order denying Tribune Publishing's motion for a preliminary injunction is **AFFIRMED** in part and **REVERSED** in part and the matter **REMANDED** for further proceedings.

**02-4126 & 02-4165,** *Salt Lake Tribune Pub'g Co., LLC, et al., v. AT&T Corp., et al.*

**O'BRIEN**, Circuit Judge, concurring in part.

I join in parts I, IIIA2 and IIIB of the opinion. I concur in the result announced in Part II. In Part IIIB we conclude the district court did not abuse its discretion in denying preliminary injunctive relief because irreparable injury was not shown. It is therefore unnecessary to address, let alone reverse, the trial court's tentative conclusion that Salt Lake Tribune Publishing Company is unlikely to prevail on the merits. Accordingly, I do not join in part IIIA1 of the opinion or in the result announced.